**FILED**

**DECEMBER 10, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**07 C 6939**

**JUDGE DER-YEGHIAYAN**
**MAGISTRATE JUDGE BROWN**

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES HALL FOSTER,                    ]
                                      ]
        Plaintiff,                    ]
        vs.                           ]        No. 05 C 6175
                                      ]
                                      ]        (formerly No. 04 L 180
                                      ]        in the Circuit Court
                                      ]        of Lake County,
                                      ]        Illinois)
                                      ]
                                      ]        Judge Der-Yeghiayan
KIRK L. HILL,                         ]
                                      ]
        Defendant-Petitioner,         ]
                                      ]
        vs.                           ]
                                      ]
UNITED STATES OF AMERICA,             ]
                                      ]
        Respondent.                   ]


        The deposition of KIRK L. HILL, called by the

Government for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before BARBARA J. SMALL, a Notary

Public within and for the County of Cook, State of

Illinois, and a Certified Shorthand Reporter of said

state, taken at 219 South Dearborn Street, Suite 500,

Chicago, Illinois, on the 3rd day of March, 2006,

at 9:30 a.m.

DEFENDANT'S
EXHIBIT

tabbies

"G"
_____

UNITED STATES
EXHIBIT

1
_____

BARBARA J. SMALL, C.S.R.

2

1    APPEARANCES:

2
        STOTIS & BAIRD CHARTERED
3        200 West Jackson Boulevard, Suite 1050
         Chicago, Illinois 60606-6941
4        By:  MR. ERIC J. PARKER

5            appeared on behalf of the plaintiff;

6        STELLATO & SCHWARTZ
         120 North LaSalle Street, 34th Floor
7        Chicago, Illinois 60602
         By:  MR. STEVEN B. BORKAN
8
             appeared on behalf of the defendant-petitioner;
9
         MR. PATRICK J. FITZGERALD
10       United States Attorney
         219 South Dearborn Street, Suite 500
11       Chicago, Illinois 60604
         By:  MR. SAMUEL S. MILLER
12            Assistant United States Attorney

13           appeared on behalf of the respondent
             United States.
14

15
                          oOo
16

17

18

19

20

21

22

23

24

25

3

1

2                          INDEX OF EXAMINATIONS

3                                                          PAGE    LINE

     KIRK L. HILL

4

5          DIRECT EXAMINATION BY MR. MILLER .......... 4          9

6          CROSS-EXAMINATION BY MR. PARKER .......... 56          5

7          REDIRECT EXAMINATION BY MR. MILLER ....... 68          9

8          CROSS-EXAMINATION BY MR. BORKAN .......... 70          17

9          RECROSS-EXAMINATION BY MR. PARKER ........ 81          15

10

11                          INDEX OF EXHIBITS

12    DEPOSITION EXHIBIT

13

14    1    e-mail April 12, 2005 between
           Mr. Hill and Commander Connie
15         Bullock ............................... 42          14

16    2    calendar for the month of March,
           2002 .................................. 46          16
17

18

19

20

21

22

23

24

25

7

1          A.    No.

2          Q.    Okay.  I want to ask you now about your time in

3    Somalia.  I want to start with that.  When did you first

4    arrive there?

5          A.    As I recall, I believe it was in October,

6    September, October of '93.

7          Q.    How long were you there?

8          A.    The deployment lasted seven months; while I was

9    in Somalia probably four to five months.

10          Q.    What was the deployment?

11          A.    It was a typical -- it was a platoon, SEAL

12    platoon that deployed with the Marines, an Amphibious

13    Ready Group.  The Amphibious Ready Group deploys five

14    ships, all of them loaded with Marines for combat, and we

15    were summoned off the coast of Somalia because General

16    Aidid there declared war on America.  So, that's why we

17    were there, because we were basically at war with a

18    warlord, Somalia warlord.

19          Q.    And this seven-month period that you described,

20    you're saying some period, five months of that you were

21    actually in the country of Somalia, and then some period

22    --

23          A.    Yes.

24          Q.    -- you were outside of Somalia?

25          A.    Yes, we were summoned, our platoon got deployed

17

1    received any guidance from an OIC or anything because I

2    was in charge of that fire team.

3        Q.    Just so I understand correctly, you're saying

4    you controlled this four-man team, approximately.

5        A.    Yes, I did.

6        Q.    And the way you learned about what you were

7    supposed to be doing was during these briefings?

8        A.    Yep.

9        Q.    Was there any other way that you learned

10   about what you should be doing other than the briefings we

11   talked about?

12       A.    No.    They were pretty thorough.

13       Q.    You mentioned a couple times that you learned

14   about the Rules of Engagement during the briefings.    Is

15   that correct?

16       A.    Yes.

17       Q.    What were you told about the Rules of Engagement

18   when you were in Somalia?

19       A.    When we were in Somalia, the Rules of

20   Engagement, if we were fired upon or engaged or felt

21   threatened in any way, shape or form we could engage the

22   enemy.    If the enemy had counter-sniper operators, RPG

23   personnel or anybody carrying a crew served weapon we

24   could kill them.    And then -- those were pretty much the

25   Rules of Engagement.

18

1      Q.   Backing up to more generally again, did the

2   Rules of Engagement vary from one deployment to another?

3      A.   Different AOs, area of operation, they -- there

4   was typically Rules of Engagement for different areas,

5   yeah.  But whenever your life or you feel threatened, in

6   those three places that I've been to, Desert Shield/Desert

7   Storm, Somalia and Bosnia, whenever your men or yourself

8   were fired or threatened upon or in any way, shape or form

9   their lives are at risk, we could always engage in.  So

10  for those three different AOs that was always paramount.

11  That was always the same.

12     Q.   Did the Rules of Engagement vary depending on

13  whether or not it was a wartime deployment or not?

14     A.   No.

15     Q.   What do you mean by that?

16     A.   Well, when -- well, I've got some sensitive

17  information, some of this stuff.

18           In Bosnia we were not at war.  We were

19  there more policing action.  But the mission that I was

20  doing, if I felt unsafe or the ambassador felt unsafe, we

21  would still be able to engage the enemy.

22     Q.   So that sometimes applied, you're saying,

23  outside of wartime deployments?

24     A.   Yep.  That was a mission we were tasked to do.

25     Q.   Did those same Rules of Engagement vary

19

1  depending on whether or not it was a Real World Mission or

2  not?

3      A.    Everything I've done in Bosnia, Desert

4  Shield/Desert Storm and Somalia was all real world.

5      Q.    I'm talking about other places, on other

6  occasions, when you were outside of those three locations,

7  did the Rules of Engagement differ?

8      A.    No.  See, typically when you go into a country,

9  whether it's the CIA, Army intelligence or SEAL

10  intelligence from our guys, you're always pre-briefed on

11  what those Rules of Engagement might be.

12      Q.    So that sounds like a "yes", that sometimes when

13  you went to other locations you were pre-briefed on a

14  different set of Rules of Engagement.  Correct?

15      A.    Yeah, but some of them were pretty much the same

16  standard for different AOs.

17      Q.    But they did vary place to place; am I

18  understanding that correctly?

19      A.    Yeah.

20      Q.    Can you give me some example of different Rules

21  of Engagement that you were given in different locations?

22      A.    In Somalia, like I said, we could engage an

23  enemy if they carried certain type of weapons, if they

24  were counter-sniper forces or if we felt threatened in any

25  way, shape or form.  That was Somalia.

20

1          In Bosnia we never engaged enemy that

2   carried weapons, so that was different.  Whereas if our

3   life was threatened, we would engage.  And so that's the

4   same.

5          In Desert Shield/Desert Storm, if we saw

6   enemy combatants, we could engage.

7          So there's a little deviation and some of

8   the stuff is the same.

9      Q.   What about outside of those three locations, did

10  you ever receive different Rules of Engagement?

11     A.   We don't get Rules of Engagement outside of

12  real-world type stuff.  You know, when we're not operating

13  or doing, when I wasn't doing Real World Missions we were

14  training.  So we were always training.  And we never

15  really discussed Rules of Engagement per se unless we were

16  on real world or tasked with types of missions.

17     Q.   Would the Real World Mission Rules of Engagement

18  apply if you were just doing training outside of a Real

19  World Mission?

20     A.   You're talking apples and oranges here.  When

21  you do a mission or you get tasked to do a mission, that's

22  when you're going to hear some form of Rules of

23  Engagement.

24          If you're not in a foreign country, I'm

25  training in the U.S. somewhere, there's no Rules of

21

1    Engagement.  There's, you know, training SOPs, standard

2    operating procedures that we're working on because we're

3    honing our tactics, our skills for war fighting.  And

4    that's -- you know, if I wasn't deployed, I was training.

5    And I was training throughout the world.

6        Q.    Let me go back to places where you were deployed

7    outside of the United States.  You've talked about three

8    places quite a bit, which is Bosnia and Somalia and the

9    Middle East.  Were you also deployed to other locations

10   outside of those?

11       A.    I've been through all the Asian countries,

12   predominantly.  Been through, you know, I've been through

13   the Arabic countries.  I've been in Germany, Iceland.  So

14   yes, I have -- you know, I've done jungle warfare in

15   Panama, I've done jungle warfare in Philippines, and

16   that's all training.  So yes, I have.

17       Q.    In any of those other places were you ever doing

18   something other than training?

19       A.    No.  If we weren't deployed for work, we were

20   deployed for training.  That's what we did.  We always

21   trained.  That's what gave us cutting edge above anybody

22   else.

23       Q.    And just so I understand you, the only places

24   where you were deployed for work or for Real World Mission

25   was Bosnia, Somalia and the Middle East countries we

22

1  talked about earlier?

2      A.    Yes, but when I deployed to other countries,

3  like I told you, the arc platoons that deployed with the

4  Marines, those two platoons, we stopped in all different

5  countries, but we were still on a deployment for wartime

6  situations, or humanitarian situations.  So, you know,

7  yeah, typically what you said is right, yes.

8      Q.    Okay.

9            When you were in Somalia were you issued

10 any weapons?

11     A.    Before I left the States I was issued a weapon.

12 Every SEAL gets issued weapons.  And when I was on the

13 East Coast team I had my own weapons, primary weapon,

14 secondary weapon, I had tertiary weapons.  And those

15 weapons by serial number were issued to me.  I kept them

16 in the armory.  I checked them when I trained.  So yes, I

17 was issued weapons.

18     Q.    Were you issued any weapons in particular for

19 Somalia?

20     A.    Not just for Somalia.  Just for anything that

21 came up throughout the world.

22     Q.    What were the weapons that you were issued?

23     A.    Typically I used, I had an M4.  Actually, no, I

24 had a car-15.  I had a car-15 and I had a 203 grenade

25 launcher on the bottom of that.  Then I had a 1911 A-1 .45

23

1  as a secondary weapon.  And those were my two primary

2  weapons.

3       Q.    What's a car-15?

4       A.    It's a version of an M16.  It's like the next

5  level.  But now the military is using M4s, which it looks

6  like an M16 but it's a little beefed-up barrel.

7       Q.    What's a 1911 A-1?

8       A.    That's a .45 caliber pistol.

9       Q.    And you say you also had a grenade launcher?

10      A.    203.  M203, yes.

11      Q.    So the M16?

12      A.    Yeah.

13      Q.    Is there a process that you need to go through

14  in order for the Navy to issue you a weapon?

15      A.    Well, to be a SEAL I had to go through SEAL

16  training.  And in that training I was -- they taught me

17  explosives usage, whether subsurface or on the water or on

18  land.  So I worked with all kinds of demolition.

19            I was trained in various types of weapons.

20  And so, yes, I received training before I was assigned to

21  a SEAL team.

22      Q.    Let me now go back to Somalia.  You described to

23  me a little bit about what the Rules of Engagement were

24  that you were given there, and you said that happened

25  during a briefing.  Correct?

24

1     A.    Yes.

2     Q.    Was there more than one briefing?

3     A.    We had -- there were times where we would

4   debrief, like say we'd come out of the field and we had

5   shootings or we killed somebody or we grabbed an intel.

6   Sometimes the intelligence officer or the CIA would want

7   to know just exactly what we -- what we did and what we

8   had seen.  So sometimes there would be a debrief.

9     Q.    Was there a separate briefing for the two

10  separate missions that you described in Somalia?

11    A.    They ran into one.  While we're protecting the

12  strongholds with sniper force to shoot anybody that was

13  trying to aggress the compound, we were actually gathering

14  intel at the same time, so.

15    Q.    But I'm trying to get at how did you discuss

16  these things before you actually went out into the field?

17  My understanding is that you have briefings before you go

18  on a mission.

19    A.    Mm-hmm.

20    Q.    And I'm trying to get at did you have just one

21  briefing in Somalia?  Or were there multiple briefings

22  where you got the information about what your task was and

23  what the Rules of Engagement was?

24    A.    The entire time I was there is pretty much

25  standard, the Rules of Engagement were the same

25

1    throughout.  They never deviated.

2        Q.    Did you have more than one briefing about that?

3        A.    No.

4        Q.    Just one time in the beginning of your

5    deployment?

6        A.    Yep, before going in country.

7        Q.    What were you told about the Rules of Engagement

8    at that one briefing, as best you can tell me?

9        A.    Like I said before, if I felt threatened or my

10   men felt threatened we could aggress and neutralize the

11   enemy.  If they were carrying crew served weapons, RPGs or

12   counter-sniper weapons we could kill them.  And, you know,

13   yes, counter-sniper force.  And yeah, that was pretty much

14   it.

15       Q.    When you were given those Rules of Engagement in

16   Somalia were you told that those applied outside of

17   Somalia at all?

18       A.    No, that was typically for the AO.

19       Q.    And the AO means that particular location?

20       A.    Area of operation, yeah.

21       Q.    Putting aside Somalia for a moment, were there

22   occasions when you were in the Navy when you did need to

23   get a superior officer's order in order to kill somebody?

24       A.    No, no.  I was in charge of that four-man sniper

25   team and I knew the Rules of Engagement, so that, that

BARBARA J. SMALL, C.S.R.

29

1   you were in noncombat positions?

2       A.    I'd say two and a half years, yes.

3       Q.    Is it correct that your position in Somalia was

4   a combat position?

5       A.    Yes.

6       Q.    Would the Rules of Engagement that applied in

7   Somalia apply to a noncombat position?

8       A.    Well, when you go into combat you are given

9   Rules of Engagement.  When you're training there's safety

10  rules that you've got to follow.  They're not the same.

11  They're two different types of rules.  But combat is a

12  whole different ball game from stateside training, so.

13      Q.    Were there any Navy personnel in Somalia that

14  were noncombat positions?

15      A.    I'm not sure.  I spent so much time in the

16  field, I really -- I guess the intelligence department,

17  there's probably some guys that weren't combatants.

18      Q.    And as far as those type of guys in Somalia, did

19  the Rules of Engagement you described for yourself in

20  Somalia also apply to people who were in noncombat

21  positions?

22      MR. BORKAN:  Objection, calls for speculation.

23      MR. MILLER:  As best you know.

24  BY THE WITNESS:

25      A.    Yeah, I couldn't really tell you.

30

1   BY MR. MILLER:

2       Q.   What about yourself, when you were an EMT in the

3   States but in the Navy, at that point what Rules of

4   Engagement applied to you?

5       A.   See, you're trying to -- you're trying to say

6   that Rules of Engagement apply stateside, and Rules of

7   Engagement -- Rules of Engagement typically deal with

8   real-world type missions and combat zones.

9       Q.   And you're saying those rules do not apply to

10  stateside?

11      A.   Not unless we are at war or felt we were at war

12  in the States, and then there would be, yes.

13      Q.   Were you in Mogadishu most of the time you were

14  in Somalia?  Is that correct?

15      A.   Yes, we worked in Mogadishu itself.

16      Q.   Did you work other locations in Somalia?

17      A.   We trained, when we came out of the field we

18  would train south of Mogadishu, southern, maybe 5, 6 miles

19  south of Mogadishu, and then we'd go back into the embassy

20  compound, then we would redeploy throughout the city.  So

21  yes.

22      Q.   When you were given the briefing where you

23  talked about the Rules of Engagement in Somalia, can you

24  tell me as best you can what was said to you about the

25  rules there?

1  upon, and mine.

2      Q.    Do you recall who in particular talked to you

3  about the Rules of Engagement for Somalia?

4      A.    Like I said before, either the CIA briefed us or

5  an Army intelligence officer or the intel rep from SEAL

6  team mate.

7      Q.    I take it you're saying you don't recall

8  specifically who it was?

9      A.    No.   It's been quite a few years, ten years now.

10      Q.    Let me switch gears now and ask you about the

11  time you spent in Millington, Tennessee?   Am I pronouncing

12  that correctly?

13      A.    Yes.

14      Q.    When did you first arrive there?

15      A.    2000, I believe the year 2000.

16      Q.    How long were you there for?

17      A.    2001.   For about a year.

18      Q.    Is it correct that that was your first shore

19  duty?

20      A.    Yes, it was.   I was operational for well over 13

21  years straight.

22      Q.    Why were you assigned to that shore duty at that

23  time?

24      A.    I was asked if I would be the SEAL detailer.   So

25  I said yes, I'd take the job.

33

1       Q.    What does a SEAL detailer do?

2       A.    There's three positions:  a SEAL detailer that

3   handles the E6 and below SEALs; there's a SEAL detailer

4   that handles the medics and guys graduating from BUDS; and

5   there's a detailer that handle the E7s and above.  And I

6   handled the medics and BUDS graduates.

7       Q.    When you say you handled them what does that

8   mean you did?

9       A.    If, when they were getting ready to graduate

10  from BUDS, SEAL training, Basic Underwater Demolition SEAL

11  training, I would write them orders to their first SEAL

12  team.  And those orders would give them money and they

13  were able to transfer from the command to another command

14  and they'd present those orders.

15              So I wrote orders for those guys.

16      Q.    Is there any particular reason that you were

17  assigned to shore duty position at that time?

18      A.    I had the option.  They said that I'd make rank

19  if I went down, took the job.  So.

20      Q.    What does it mean when you say "make rank"?

21      A.    I was a chief at the time.  They said I'd make

22  senior chief if I took that job.

23      Q.    And was that the reason that you chose to take

24  the job?

25      A.    Sure.  I wanted to progress my career.

36

1  them.

2  BY MR. MILLER:

3       Q.    Anything other than the court-martials?

4       A.    No.

5       Q.    Were your duties changed at all as a result of

6  this incident?

7       A.    Yes.

8       Q.    How were they changed?

9       A.    Well, I was sent to Naval Hospital Great Lakes

10  where I was evaluated.

11       Q.    Did the Navy restrict your access to weapons at

12  all after that incident?

13       A.    Yeah, I never went back operational after that.

14       Q.    And because you were not operational that meant

15  you didn't have access to weapons.  Is that correct?

16       A.    No.  I mean I had my own personal weapons, but

17  no.

18       Q.    When you say "no" what do you mean?  I'm sorry,

19  I didn't understand that last part.

20       A.    No, I did not have access to weapons.

21       Q.    And when you say your own personal weapons, what

22  do you mean by that?

23       A.    I have hunting weapons.

24       Q.    But those are your own, not issued to you by the

25  Navy?

37

1       A.   No, they are my own.

2       Q.   Who made the decision that you should be

3  hospitalized?

4       A.   Who made the decision.

5       Q.   As best you know.

6       A.   Well, I'm not sure.

7       Q.   Do you recall anything about the decision to

8  hospitalize you?

9       MR. BORKAN:   Same objection, relevance.  Kirk, you

10  can answer.

11  BY THE WITNESS:

12       A.   You'd probably have to talk to my doctors

13  because I'm not sure.

14  BY MR. MILLER:

15       Q.   Do you know what the reason for your

16  hospitalization was?

17       A.   I believe I was being evaluated.

18       Q.   Were there both inpatient and outpatient periods

19  at the hospital?

20       A.   Yes.

21       Q.   When did the inpatient hospitalization begin and

22  end?

23              (Phone interruption)

24       MR. BORKAN:   Excuse me one second.

25       MR. PARKER:   Do you want us to stop for one minute

38

1    while you get that?

2        MR. MILLER:  We're stopping for one second.

3            (Brief pause.)

4        MR. BORKAN:  Is there a question pending?

5        MR. MILLER:  There was, but I'm just going to ask it

6    again.

7        MR. BORKAN:  Okay, let's take five.

8            (Brief recess.)

9        MR. MILLER:  We're back on the record.

10   BY MR. MILLER:

11       Q.   My question was, just before we stopped, when

12   did your inpatient hospitalization begin and end?

13       A.   I believe, best of my recollection, September of

14   '01 and then I think they let me out January, '02.  An

15   outpatient basis.

16       Q.   That's my next question, when did your

17   outpatient hospitalization begin and end?

18       A.   January, '02 it started, and I was incarcerated

19   in March.

20       Q.   Of '02?

21       A.   Of '02.

22       Q.   What happened that made it possible for you to

23   become an outpatient, as best you know?

24       A.   I was doing everything that they asked of me.

25       Q.   When you went to the Great Lakes Naval Hospital,

40

1       Q.    And I mean to be just asking you about your

2   supervisors.  Did any of your supervisors at Great Lakes

3   assign you a Real World Mission?

4       A.    They, when I went to an outpatient they did

5   assign me duties.

6       Q.    What were the duties?

7       A.    They sent me into the gym to work at the gym.

8       Q.    Was that a Real World Mission?

9       A.    No.  Well, it was a real world job.  It was

10  tasking.

11      Q.    I mean Real World Mission in the sense that we

12  talked about earlier this morning.

13      A.    No.  Like I said before, you know, I'm always a

14  SEAL first and foremost.

15      Q.    Right, but I'm asking about that particular task

16  or that particular --

17      A.    Well, it's --

18      Q.    -- assignment to the gym.  When you --

19            Let me just finish, sorry.  I don't mean to

20  cut you off, but let me finish.

21            That particular assignment to the gym, was

22  that given to you as a Real World Mission by your

23  supervisors?

24      A.    No.

25      Q.    When did you start working at the gym?

41

1        A.    I'd say January, 2002 I started, best

2    recollection.

3        Q.    What was the name of your position there?

4        A.    I was helping the Physical Readiness Coordinator

5    for the naval hospital with his duties.

6        Q.    Were you a Physical Readiness trainer?

7        A.    No.  I assisted him.

8        Q.    Did you have a particular title associated with

9    your position there?

10       A.    I really couldn't tell you.  I mean they always

11   referred to me as a SEAL.

12       Q.    Was your position there at Great Lakes a combat

13   position?

14       A.    Combat?  No.

15       Q.    Were you issued any weapons for that position at

16   Great Lakes?

17       A.    No.

18       Q.    When you were in that position did you receive

19   any training or instruction regarding the Rules of

20   Engagement that would apply there?

21       A.    What you've got to remember is if I saw an enemy

22   combatant in any situation, it could be in this building,

23   I would be trained to aggress that individual.  And

24   that's, it's instinctive.  I can't even explain to you

25   how, how aggressive should I see an enemy combatant.  So,

42

1  you know.

2      Q.   I think I understand that part from what you've

3  testified earlier.  I do want to ask you specifically

4  about training or instructions, though.

5      A.   Okay.

6      Q.   Did you receive any training or instructions at

7  Great Lakes about the Rules of Engagement there?

8      A.   No, I did not.

9      MR. MILLER:  Let me now show you an exhibit which I'm

10 going to ask the court reporter to mark as Exhibit 1.

11          (WHEREUPON, said document was marked Hill

12          Deposition Exhibit No. 1 for

13          identification, as of 3-3-06.)

14     MR. MILLER:  This is an e-mail exchange dated April

15 12, 2005 at the top between Mr. Hill and Commander Connie

16 Bullock.

17 BY MR. MILLER:

18     Q.   Let me ask you first, do you recognize this

19 e-mail?

20     A.   Yes, I do.

21     Q.   And the portion of this e-mail that's written

22 above your name there in the middle, was that written by

23 you?

24     A.   Yes.

25     Q.   About halfway down that paragraph do you see the

43

1   part about your responsibilities at the gym?

2       A.   Yes.

3       Q.   Where it says, "My responsibilities were to do

4   lead various exercises for overweight sailors.  This would

5   involve stretching, running, calisthenics, and sometimes

6   playing basketball.  Usually once a month we would test

7   these individuals to see if they met the Physical

8   Readiness requirements for their age and body weight."

9       A.   Yes.

10      Q.   Is that an accurate statement of what your

11  duties and responsibilities were at the gym?

12      A.   One thing you've got to remember though, as a

13  SEAL, you know, situation arises, I see an enemy combatant

14  or anything along those lines, I'm a SEAL first.

15  Everything else is secondary.

16      Q.   What about the statement here in the e-mail, is

17  that an accurate statement of your duties and

18  responsibilities at the gym?

19      A.   Yes.

20      Q.   Let me direct you to the part about your

21  supervisor being Chief Frausto, on the third line.  Do you

22  see that there?

23      A.   Yes.

24      Q.   What was his or her full name?

25      A.   I do not remember.

45

1    specifically who it is?

2         A.    No, I don't.

3         Q.    Okay.

4         A.    I don't recall.

5         Q.    As best you can recall, when you were talking

6    about your duties and responsibilities at the gym, did

7    anyone tell you that that job would involve combat duties?

8         A.    No, I never really discussed any combat-type

9    stuff with anyone.

10        Q.    Did Chief Frausto at any point tell you that

11   your job there at the gym would involve combat duties?

12        A.    Yeah, but, see, you're missing the mark.  All my

13   training, I'm always focused on combat.  I can't get rid

14   of it.  It's instilled in me.  So if I was to come across

15   an enemy combatant right out here on the street, I'd

16   probably aggress that individual as violently as I could

17   if I thought he was a detriment to our country.

18        Q.    I understand that part.  And I want to get to

19   again what Chief Frausto might have said to you or not

20   said to you.  Did Chief Frausto ever tell you at any point

21   that your job at the gym would involve combat duties?

22        A.    I don't recall ever talking to Chief Frausto

23   about any of that type stuff that I've been exposed to

24   mission-wise.

25        Q.    Did Chief Frausto ever authorize you in any way

46

1    to use force in your job there at the gym?

2        A.    You've got to remember, I outranked Chief

3    Frausto.  I was a chief, he was a chief, but he was a boot

4    chief so there's no way he's going to tell me anything as

5    far as responsibilities.

6        Q.    So I take that as a "no", he never told you

7    about using force in that job?

8        A.    We never discussed it.

9        MR. MILLER:  Let me now show you another exhibit

10   which is a calendar.  I'm going to ask the court reporter

11   to mark this as Exhibit 2.

12               (WHEREUPON, said document was marked Hill

13               Deposition Exhibit No. 2 for

14               identification, as of 3-3-06.)

15   BY MR. MILLER:

16       Q.    It's a calendar for the month of March, 2002.

17   Do you recognize this calendar?

18       A.    Yes.

19       Q.    What is it?

20       A.    It was a work schedule for fitness enhancement

21   sessions.

22       Q.    Let me direct you to March 5th on the calendar

23   there.  Do you see that part?

24       A.    Yes, I do.

25       Q.    What is the meaning of the schedule shown on

47

1  that date?

2      A.   I was required to be there at 1300 at the gym.

3      Q.   And what were you doing, what were you scheduled

4  to do at 1300 that day?

5      A.   If my recollection is correct, I was to assist

6  or lead some form of physical training, I would imagine.

7      Q.   The calendar here appears to show you working

8  once a week.

9      A.   Looks that way.

10     Q.   Is that accurate as far as you can tell, that

11  you were working once a week in your gym position?

12     A.   I never worked those other three shifts.  I was

13  incarcerated, I believe, somewhere around that 5th.

14     Q.   Before the incident on the 5th were you

15  scheduled to work just once a week?

16     A.   I couldn't tell you.

17     Q.   Do you recall whether it was a full-time job

18  where you were working full-time?

19     A.   No, I don't think it was, because I was

20  outpatient.

21     Q.   How much time were you working as best you can

22  tell?

23     A.   I'm not sure, to tell you the truth, because it

24  was from January or March, somewhere in there I was

25  scheduled to show up.

48

1   Q. But the indications on this calendar look like

2 at least you were working approximately once a week.

3   A. You know, I'm not sure, but I think they might

4 have asked me to, if I'd schedule it in myself, so I'm not

5 sure what I was working prior to that.

6   Q. Do you think you were working a lot more than

7 once a week?

8   A. I don't think so, you know, because I had to,

9 you know, go to the hospital every day.

10   Q. Is once a week a fair guess for the amount of

11 time you think you were working?

12   A. I can't really say.

13   Q. Was your position there a limited duty position?

14   A. I was in limited duty status, I believe.

15   Q. What does that mean?

16   A. Limited duty typically there's some kind of

17 medical condition that requires that you are not able to

18 work full duty, be on full duty.

19   Q. Does limited duty mean there's some restrictions

20 on the work you can do?

21   A. Yes.

22   Q. Do you know what the restrictions were on you?

23   A. No, I don't.

24   Q. Let me now ask you about a particular incident

25 on March 5th with Mr. Foster.  As best you can recall,

49

1   what were you doing just before the incident?

2        A.    That I don't know.

3        Q.    Were you working out in a weight room?

4        A.    I don't think so.

5        Q.    What makes you say that?

6        A.    Because I'm not sure.

7        Q.    Do you recall where the incident occurred?

8        A.    You know, I'm not sure.

9        Q.    Did it happen in the locker room?

10       A.    This much I do know:  When I saw who I now know

11  as James Foster, I recognized him as General Aidid, a

12  Somali warlord.  And when I saw him, I had fear for my

13  life and I thought, my only instinct was, as a SEAL, that

14  I needed to kill this guy or he was going to kill me.

15  That much I remember.

16       Q.    What time did the incident occur as best you can

17  remember?

18       A.    I couldn't tell you a time.

19       MR. BORKAN:  I'm sorry, I'm going to interject

20  because as far as foundation is concerned, and I know it's

21  that speaking objections are not really allowed, but as

22  far as foundation is concerned one of the things I want to

23  interject here is, so I don't have to continue making

24  objection, foundation, is that you're referencing what he

25  knew at the time versus what he knows now, correct?  Or

50

 1  not?  Because there's a whole --

 2       MR. MILLER:  Well, I can ask a question about that to

 3  clarify.

 4       MR. BORKAN:  Right.  That would be a whole different

 5  -- that's why I don't want to keep objecting to

 6  foundation, counsel.

 7       MR. MILLER:  Okay.  Well, I think maybe we can

 8  probably clear that up, so let me try asking some other

 9  questions that will possibly resolve that.

10  BY MR. MILLER:

11       Q.    Do you now know where the incident occurred?

12       A.    Yes.

13       Q.    Where did it occur?  Based on what you now know.

14       A.    At the gym in Great Lakes.

15       Q.    What time did the incident occur?  Based on what

16  you now know.

17       A.    That I'm not sure.  Now, I have this calendar in

18  front of me and it says I was supposed to be there at

19  1300, so my best guess, it had to have happened after

20  1300.

21       Q.    Why do you say it happened after 1300 is your

22  best guess?

23       A.    Just based on the schedule, I had to be there by

24  1300.

25       Q.    Did you ever go to the gym before 1300?

51

1      A.    That I couldn't tell you.  I mean I was pretty

2   punctual at being at work maybe a half-hour, hour early

3   sometimes, but I couldn't tell you the exact time.

4      Q.    Is it possible this incident occurred before

5   1300 hours?

6      A.    Not sure.

7      Q.    Do you know who else was present at the time of

8   the incident based on what you now know?

9      A.    No.

10     Q.    Let me ask you about something in your affidavit

11  here, which I'm not going to make an exhibit, but I will

12  show you a copy.

13             Let me have you take a look at paragraph 16

14  in there.  Do you see the part where it says you

15  encountered Mr. Foster while at work at the gym?

16     A.    Yes.

17     Q.    Are you sure or are you unsure whether or not

18  you were actually working at the time you encountered

19  Mr. Foster?

20     A.    Well, based on this work schedule, I'd have to

21  say I was there because of it.

22     Q.    Do you have any other independent memory of

23  whether or not you were working, other than looking at the

24  work schedule?

25     A.    No.

52

1      Q.   So you're just, I take it, guessing based on the

2   work schedule, that you must have been at work at the time

3   of the incident?

4      A.   Yeah, I'm pretty good about being where I need

5   to be.

6      Q.   Was Mr. Foster one of the individuals who was in

7   your class that you were supposed to be training that day?

8      A.   I couldn't really tell you, because if

9   Mr. Foster was to walk into this building right now, in

10  all honesty, I wouldn't be able to recognize him.  I don't

11  know what he looks like.

12     Q.   Do you know if he's a member of the Navy?  As we

13  sit here today.

14     A.   I now know that he works at the hospital.

15     Q.   Does he work there as a member of the Navy or in

16  some other type position?

17     A.   That I'm not sure of.

18     Q.   Is he a civilian type employee?

19     A.   I don't know that much about James Foster.

20     Q.   So you don't know one way or another whether

21  he's a civilian?

22     A.   No.

23     Q.   From what you've learned since the time of the

24  incident, did Mr. Foster threaten you in any way that day

25  on March 5th?

58

1  A.  I never really said who gave me the assignment.

2  Q.  Do you know who assigned you to work in the gym?

3  A.  Not sure.

4  Q.  Okay.

5  A.  It had to be one of my doctors, I would imagine.

6  Q.  And also it referenced a person by the name of

7  Ann Cirocco or Ann Clinton Cirocco.  Do you know who that

8  is?

9  A.  She was the social worker, I believe, at the

10  hospital.

11  Q.  And is it the same situation where you don't

12  recall if she assigned you to work in the gym?

13  A.  Yeah.  You know, I'm not sure who gave me the

14  job.

15  Q.  When you were initially transferred to Great

16  Lakes Naval Hospital as an inpatient, your sole reason for

17  being there was to receive treatment.  Is that correct?

18  A.  Yes.

19  Q.  Okay.  And as an outpatient your primary reason

20  for being there was to receive treatment, is that correct?

21  A.  Yes.

22  Q.  Other than working in the gym a few hours a

23  week, the rest of your responsibilities revolved around

24  getting treatment, correct?

25  A.  Yes.

62

1     MR. BORKAN:  Objection to what the perspective of the

2   Navy was.  It's improper basis for the question.  It's

3   limited to -- this would be limited to Mr. Hill.  With

4   regard to the perspective of the Navy, that's got to be

5   somebody else.  He can't answer that question.

6     MR. PARKER:  Are you instructing him not to answer?

7     MR. BORKAN:  No, but I'm telling you it calls for

8   speculation.  I don't know how he could.  So, you know

9   what?  Unless foundationally -- objection, foundation,

10  unless he knows.  So I think you have to establish the

11  foundation if he knows first.

12    MR. PARKER:  Do you understand the question?

13  BY THE WITNESS:

14    A.   At the time I was dealing with Mr. Foster I

15  couldn't make that decision other than the fact that I

16  thought he was a Somali warlord.  So at that time the

17  Rules of Engagement did play into effect.

18  BY MR. PARKER:

19    Q.   Somalia -- well, strike that.

20         The Somalia assignment had been

21  approximately 1993, correct?

22    A.   Yeah, '93, '94.

23    Q.   Okay.  And had anybody in the Navy told you that

24  the Rules of Engagement for Somalia would apply at Great

25  Lakes Naval Hospital, in 2002?

63

1      A.    Did anybody tell me?

2      Q.    Yes.

3      A.    No.

4      Q.    Was it your understanding that should you

5    encounter a Somali warlord in North Chicago, Illinois in

6    2002, that you had authority under the Rules of Engagement

7    to attack that person?

8      A.    I didn't know I was in Chicago, North Chicago.

9    At the time I thought I was dealing with a Somali warlord

10   in front of me and I wasn't aware of what was going on

11   around me.  I just thought he was there to kill me and I

12   needed to kill him.  That's what was going on.

13     Q.    My only question, though, is not about what you

14   were thinking or feeling internally.  I'm asking whether

15   you understand that you were under Rules of Engagement

16   that would allow you to attack even a Somali warlord at

17   that point in time.

18     A.    I would react the same, I think, based on my

19   SEAL training to aggress an enemy combatant no matter if

20   it was in the States or across -- you know, terrorists,

21   they've infiltrated our borders.  9/11 is a perfect

22   example.  If I saw one on the street, you can damn well

23   bet I'm going to tighten them up.

24     Q.    My question, though, is whether the Navy in any

25   way, shape or form has told you that you had authority to

68

1    was there at 1300 or to be there at 1300.

2        MR. PARKER:  I don't have any other questions.  Thank

3    you.

4        MR. MILLER:  I have a few follow-ups, but I don't

5    care about the order, so do you want to go first?

6        MR. BORKAN:  No, go ahead, as long as you've got

7    them.

8        MR. MILLER:  It's very quick.

9                       REDIRECT EXAMINATION

10   BY MR. MILLER:

11       Q.   Let me direct you back quickly to the Exhibit 1

12   which is the e-mail exchanged with Commander Bullock, and

13   specifically I'd like you to look at the first sentence

14   where you say, "I was assigned to work at the gym by

15   Dr. Sommons and social worker Ann Clinton Cirocco", which

16   is spelled C-i-r-o-c-c-o, "both of whom were part of my

17   treatment team."  See that part?

18       A.   Yep.

19       Q.   Is that accurate as far as you know?

20       A.   Yes.

21       Q.   And earlier in your testimony you expressed some

22   uncertainty about who actually assigned you to the gym,

23   correct?

24       A.   Yeah, I haven't looked at this e-mail.  When was

25   this?  This was April 12, 2005.  Yeah.

69

1      Q.   This e-mail refreshes your recollection about

2   who assigned you?

3      A.   Yes, the e-mail does.

4      Q.   Let me now direct you to the second sentence.

5   It says, "As far as my supervisor, that was Chief Frausto

6   who ran the Physical Readiness Program for the Naval

7   Hospital Great Lakes."   Do you see that part?

8      A.   Yes.

9      Q.   Does that refresh your recollection that Chief

10  Frausto was your supervisor there?

11     A.   Yes.

12     Q.   And that's an accurate statement?

13     A.   Yes.  We worked together, but like I said, I did

14  outrank Chief Frausto.  So we had a mutual working

15  agreement, so.

16     Q.   Is it possible for somebody who you outrank to

17  still be your supervisor?

18     A.   Not typically.

19     Q.   Can you explain to me why it is that you

20  described him as your supervisor in this e-mail, based on

21  what you are saying here today?

22     A.   Because he ran the Physical Readiness Program

23  for the hospital.  I just helped him out.

24     Q.   And did he tell you what you needed to do in

25  order to help him out?

76

1  SEAL and I'll always be trained as a SEAL.

2       Q.   So would it be fair to say that at the time of

3  the incident with Mr. Foster that you are charged with the

4  duty by the United States to engage the enemy if you see

5  the enemy?

6       MR. MILLER:  Objection, leading.

7  BY THE WITNESS:

8       A.   Yes.  If I see the enemy, I am trained to engage

9  the enemy before they engage me.

10 BY MR. BORKAN:

11      Q.   And would it be fair to say that on March 5,

12 2002, while on temporary assignment to the Physical

13 Readiness training facility, that you are still required

14 by your assignment -- I'm sorry, strike that -- by the job

15 with the United States to engage the enemy?

16      MR. MILLER:  Objection, leading, foundation.

17      MR. BORKAN:  You can answer.

18 BY THE WITNESS:

19      A.   Yes, I would engage the enemy as a Navy SEAL,

20 because that's what I was trained to do.

21 BY MR. BORKAN:

22      Q.   And do you know if that would, if what we have

23 described and what has been described, the incident at the

24 gym, understanding that you were under the impression this

25 was General Aidid, is that what the government would have

77

1  expected of you?

2      MR. MILLER:  Objection.  Leading, foundation.

3  BY MR. BORKAN:

4      Q.   Do you know?

5      A.   Yes.  As a Navy SEAL, when I saw General Aidid

6  there, my first instincts were to get him before he killed

7  me.

8      Q.   Do you know whether or not that is what would

9  have been expected of you as a Navy SEAL?

10     A.   Yes, it would have been.

11     MR. MILLER:  I'm going to object to the extent I

12 don't think there's a foundation for that.  He answered

13 the question as if there was, even though you asked him if

14 he knew, but.

15     MR. BORKAN:  Well, I mean --

16     MR. MILLER:  I'll leave it at that.

17     MR. BORKAN:  Okay.

18 BY MR. BORKAN:

19     Q.   I take it that you do know, that that is what

20 would be expected of you.

21     A.   Yes, it would be.

22     Q.   How do you know that?

23     A.   Because he's an enemy combatant of the U.S.  It

24 would be -- he would be a target of ours, especially he

25 had declared war on the U.S.  He was an enemy of the

78

1  State.

2       MR. BORKAN:  Just let me check my notes.

3                    (Brief pause)

4  BY MR. BORKAN:

5       Q.   There was a lot of discussion about Rules of

6  Engagement and the difference between Rules of Engagement

7  and Real World Missions and -- or real world assignments,

8  if we call them, and stateside assignments.

9                 The Rules of Engagement as you are

10 discussing them are what?  What is a Rule of Engagement?

11      A.   It's kind of laws or guidance that's given to

12 you when working in a foreign country conducting real

13 world operations.  It's your basis for what you can and

14 can't do legally.  So when they say if you are being

15 aggressed or shot at or somebody is carrying a crew served

16 weapon or an RPG you can kill them, then that's your

17 guidance, and you try not to deviate from that or else you

18 can be held accountable.

19      Q.   And when we talk about Rules of Engagement, can

20 we talk about Rules of Engagement with respect to specific

21 individuals, such as General Aidid?

22      A.   Yes.  He --

23      Q.   What would be the Rules of Engagement with

24 regard to General Aidid?

25      MR. MILLER:  Objection, foundation.

79

1  BY MR. BORKAN:

2       Q.   Do you know what the Rules of Engagement would

3  be with regard to General Aidid?

4       MR. MILLER:  Objection, foundation.

5  BY MR. BORKAN:

6       Q.   As of 2002.

7       MR. MILLER:  Sorry, I didn't mean to interrupt, but

8  same objection.

9  BY THE WITNESS:

10      A.   It would be to kill General Aidid.

11 BY MR. BORKAN:

12      Q.   And would that apply whether in Mogadishu or the

13 United States?

14      MR. MILLER:  Same objection.

15 BY THE WITNESS:

16      A.   No, it wouldn't.  He'd be a target as an enemy

17 combatant of the U.S.

18 BY MR. BORKAN:

19      Q.   Okay, so when I said whether it would apply,

20 you're agreeing with me.  It applies equally anywhere in

21 the world?

22      A.   Yes.

23      MR. MILLER:  Same objection.

24           Can I make a standing objection?

25      MR. BORKAN:  You may.

80

1        MR. MILLER:  I don't want to keep interrupting you.

2        MR. BORKAN:  It's okay.

3   BY MR. BORKAN:

4        Q.   There was discussion about the assignments at

5   the gym which would be temporary assigned duty, you called

6   it T.A.D.

7        A.   Yes.

8        Q.   And I think you agreed that yes, we can agree

9   that an assignment such as Physical Readiness is not what

10  would be characterized as a Real World Mission; is that

11  fair to say?

12       A.   Yes.

13       Q.   Would that make any difference with respect to

14  encountering an enemy combatant such as General Aidid?

15       A.   No, it would not.

16       Q.   With regard to your naval SEAL training, are you

17  trained to use combat tactics without the use of weapons?

18       A.   Yes, we, I've received stick fighting, knife

19  fighting, kick boxing.  So I have trained without the use

20  of weapons, some hand-to-hand.

21       Q.   Why?  What's the purpose of training with

22  hand-to hand and/or other objects that aren't firearms?

23       A.   The whole basis of a SEAL is to kill the enemy.

24  And all my training and everything focused, it's all about

25  killing the enemy.  Sure, the missions may vary a little

87

1  that, and you've led him through the questioning, that the

2  --

3       MR. BORKAN:  And I'm entitled to do that.

4       MR. PARKER:  You absolutely may.  My point is you've

5  led him through questioning --

6       MR. MILLER:  I don't agree with the leading part, but

7  go ahead.  I made my objection on that.  I don't think

8  that counsel can lead his own witness.  But go ahead.

9       MR. PARKER:  You led him through questioning to

10  establish that the U.S. Navy assigned him and expected him

11  to kill a Somali warlord while he was at Great Lakes Naval

12  Hospital.  And I don't think it's inappropriate for me

13  then to ask the question:

14  BY MR. PARKER:

15       Q.   Did the Navy -- was it your understanding that

16  the Navy had assigned you to kill Somali warlords during

17  the time you were receiving treatment for this prior

18  incident in Tennessee?

19       A.   Well, I would say to that what I've said before

20  is at the time I saw who I now know is James Foster, I saw

21  him as General Aidid, a Somali warlord.  I did not know

22  where I was at at the time.  I aggressed him as an enemy

23  combatant based on the Rules of Engagement that I know.

24       Q.   And then the last question I have then is did

25  anybody at the Navy tell you that while you were at Great

88

1   Lakes Naval Hospital they expected you to be carrying out

2   such a mission?

3        A.    I don't believe anyone had said that.

4        MR. PARKER:  Okay.  That's fine.  I don't have any

5   other questions.

6        MR. MILLER:  Nothing further for me.

7        MR. PARKER:  Mr. Hill, I haven't meant to intend any

8   offense to you in any way.  I need to ask the questions.

9        MR. BORKAN:  Fair enough.

10                   Signature reserved.

11                   FURTHER DEPONENT SAITH NOT.

12

13

14

15

16

17

18

19

20

21

22

23

24

25