FILED

DECEMBER 10, 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

KC2

30707          12/3/07          SBB:dsa               WHITE          1568919173

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

07 C 6939

COPY

| | | |
|---|---|---|
| JAMES HALL FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: 04 L 180 |
| | ) | |
| KIRK L. HILL, | ) | |
| | ) | |
| Defendant/Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE BROWN**

## DEFENDANT/PETITIONER KIRK L. HILL'S MEMORANDUM IN SUPPORT OF HIS PETITION TO FIND AND CERTIFY THAT HE ACTED WITHIN THE SCOPE OF HIS FEDERAL EMPLOYMENT AND SUBSTITUTE THE UNITED STATES OF AMERICA AS THE SOLE DEFENDANT

Defendant/Petitioner, Kirk L. Hill, submits this Memorandum of Law in support of his Petition under the Federal Employees Liability and Reform Tort Compensation Act of 1988 (the "Westfall Act"), Public Law 100-694, 28 U.S.C. § 2679(d)(3), requesting this Court to: (1) certify that he acted within the scope of his federal employment as a United States Navy SEAL member on March 5, 2002; (2) strike the scope certification issued by the United States Attorney for the Northern District of Illinois; and (3) substitute the United States of America as the sole defendant in this action.

## I.   INTRODUCTION

Defendant/Petitioner Kirk Hill challenges the Attorney General's refusal under the Westfall Act to certify that he acted within the scope of his federal employment as a Navy SEAL. Defendant

EXHIBIT
1

incorporates by reference the Statement of Facts in his Petition, as though fully set forth herein, which establish that on March 5, 2002 – as the result of an insane delusion – Hill assaulted an individual he believed was an enemy combatant, while Hill was in out-patient psychiatric treatment at the Great Lakes Naval Base.

## II. ARGUMENT

This Court should overturn the Attorney General's refusal to certify that Kirk Hill acted within the scope of his federal employment as a Navy SEAL on March 5, 2002, when he was involved in an altercation with James Foster at Great Lakes Naval Base Hospital, while suffering the delusion that Foster was General Mohammed Farrah Aidid, a Somali warlord there to kill him.

### 1. Standard Governing Review Of A Scope-Of-Employment Decision

Under the Westfall Act, the Attorney General may certify that a federal employee named as a defendant in a civil lawsuit was "acting within the scope of his office or-employment at the time of the incident" that serves as the basis for a tort claim against that employee. 28 U.S.C. § 2679(d)(1).[1] If the Attorney General certifies that federal employees acted within the scope of their employment, those employees are immune from suit on claims arising from the certified conduct, and the United States is substituted as the defendant with regard to those claims. 28 U.S.C. §§ 2679(b)(1), (d)(1). If the Attorney General refuses to certify that federal employees acted within the scope of their employment, those employees may challenge the Attorney General's scope certification at "any time before trial" by filing a petition with the court where the action is pending to review that decision. 28 U.S.C. § 2679(d)(3). Illinois law governs whether Hill acted within the

---

[1]    The Attorney General delegated the authority to make such scope-of-employment certifications to the United States Attorneys regarding civil actions brought against federal employees in their respective districts. *See* 28 C.F.R. § 15.3(a).

scope of his employment under the Westfall Act. *Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir.1998); *see also Snodgrass v. Jones*, 957 F.2d 482, 484 (7th Cir. 1992)(FBI agent driving FBI-provided car to a bar for four to five hours before colliding with another vehicle was not acting within the scope of his employment).

Under Illinois law, there are four relevant factors for the Court to analyze in deciding whether Hill acted within the scope of his employment when he struck who his insane delusion told him was General Aidid, which are:

1. Was this act "of the kind" the Navy employed Hill to perform?;
2. Did Hill's act occur substantially within authorized time and space limits?;
3. Was Hill's act actuated, at least in part, by a purpose to serve the Navy?; and
4. Was Hill's intentional use of force "unexpectable"?

*Bagent v. Blessing*, 224 Ill.2d 154, 163-65, 862 N.E.2d 985, 991-93 (2007); *Pyne v. Witmer*, 129 Ill.2d 351, 358, 543 N.E.2d 1304, 1308 (Ill. 1989); *Copeland v. County of Macon, Illinois*, 403 F.3d 929, 932 (7th Cir. 2005); *Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998); Restatement (Second) of Agency § 228(1)(1958).

Although Illinois courts have not addressed the scope of employment for members of the military services, they – and federal courts (applying Illinois law) – have addressed scope-of-employment issues for police officers accused of negligent and more egregious misconduct. These cases provide an apt analogy to the military, because Illinois courts consider police departments to be paramilitary organizations. *Launius v. Board of Fire and Police Commissioners*, 151 Ill.2d 419, 436-37, 603 N.E.2d 477, 484-85 (1992).

### 2. Assaulting Enemies Of The United States Is Conduct "Of The Kind" The United States Navy Employs A SEAL To Perform

This Court should overturn the United States Attorney's decision that Kirk Hill acted outside

the scope of his Navy SEAL employment because the government applied the wrong standard for deciding whether Hill's conduct was "of the kind" he was employed to perform. Although the United States Attorney acknowledged that Cmdr. Hill "had been a seasoned member of the U.S. Navy's elite special forces for years," the United States Attorney focused on the fact that "once he was diagnosed with serious mental problems following an attack on an officer in Tennessee, he was transferred in a temporary duty status to Great Lakes Naval Hospital for treatment, not combat." (Thomas F. Walsh letter to M.H. Anderson, Captain, U.S. Navy Medical Corps [Exhibit D] at 2). Although it is not clear, it appears that the United States Attorney believed that Hill's delusional reversion to his combat training was not the kind of conduct that the Navy employed him to perform because the Navy assigned him to lead overweight sailors in exercise and stretching, and did not specifically authorize his use of combat rules of engagement under those circumstances. This is not the test for scope-of-employment decisions in Illinois.

In *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 706 N.E.2d 914 (1st Dist. 1999), the First District Appellate Court addressed the first three scope factors in a wrongful death case where a Chicago police officer brought his service revolver home and negligently stored it, thus allowing his teenage son access to the gun, which he used to kill another child. In holding that the off-duty Chicago police officer acted within the scope of his employment, the court held that "The first factor is that the act of the servant must be 'of the kind' the servant was employed to perform. ... This concept is broad enough to include not only conduct which the employer has authorized, but also conduct of the same general nature as that authorized and acts 'incidental' to authorized conduct." *Id.* at 49, 704 N.E.2d at 920 (quoting Restatement (Second) of Agency § 229(1) and cmt. a, at 506).

In order for an act to be "incidental" to authorized conduct – and thus within the kind of acts

employees perform within the scope of their employment – the *Gaffney* court held that the act must be consistent with the employer's ultimate goal, and must be:

> "subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do. The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive."

*Id.* at 49, 704 N.E.2d at 920 (quoting Restatement (Second) of Agency § 229 cmt. b, at 508); *see also Adames v. Sheahan*, No. 01-05-3911, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2007 WL 2984077 (1st Dist. Oct. 11, 2007)(an employer's "express prohibition" against conduct does not remove it from being incidental to the employee's scope of employment).

Thus, the United States Attorney focused too narrowly on the fact that the Navy only expressly authorized Hill to assist the Physical Readiness Coordinator to help overweight sailors stretch and comply with their physical fitness requirements, and did not authorize him to use the rules of engagement that he used in Somalia during his assignment at the Hospital. The Navy trained Hill to instinctively be a SEAL at all times, and to use force in the context of military operations and kill enemy combatants, such as General Aidid, regardless of whether he found them in Somalia, Bosnia, Iraq, or in the United States.  (Hill dep. [Exhibit G] at 38-39, 41-43, 45, 71-74).  Although the Rules of Engagement for killing enemy combatants "typically deal with real-world missions and combat zones" outside the United States, Hill testified without contradiction that the Rules of Engagement apply equally to the United States if the Navy was at war or felt it was at war in this country. (Hill dep. [Exhibit G] at 30, 59-60, 63-64).  This is consistent with the oath the Navy administers to all new recruits: that they will defend the United States against its enemies, both foreign and domestic.

5

Hill further testified that in accordance with his SEAL training, the Rules of Engagement allowed him "to aggress an enemy combatant no matter if it was in the States or – you know, terrorists, they've infiltrated our borders. 9/11 is a perfect example. If I saw one on the street, you can damn well bet I'm going to tighten them up." (Hill dep. [Exhibit G] at 63). In its pleadings and evidentiary materials file thus far, the United States has offered no contrary evidence from the Department of Defense or the Navy to contradict Hill's testimony about whether he was authorized to use deadly force within the United States against an enemy combatant who infiltrated the United States, and thus that testimony stands uncontroverted. (United States Response [Exhibit H]).

The United States Attorney thought that it was relevant that the Navy could not have imagined that an insane Navy SEAL would resort to his SEAL training and the Rules of Engagement he learned in Somalia:

> In contrast to the situation in *Graham*, Mr. Hill was far removed from any reasonable combat situation while on temporary detail for psychiatric treatment to Great Lakes Hospital. It is possible to imagine a scenario under which Mr. Hill might have been expected to react to a perceived threat with violence, but the exercise requires so much imagination that it would be difficult to say that the [*sic*] a [*sic*] the [*sic*] time of the attack, Mr. Hill was engaged in the kind of action he was employed to perform or that the use of force was expectable. According to the court in *Graham*, the "focus must be on the nature of the services contemplated" (*id.*), and it is simply too much of a stretch to conclude that Mr. Hill's locker-room actions while in that temporary duty status were of the kind that were contemplated.

(Thomas F. Walsh letter to M.H. Anderson, Captain, U.S. Navy Medical Corps [Exhibit D] at 2).

Under Illinois law, however, "The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive'" on whether the employee was engaged in the type of work he was employed to perform. *Gaffney v. City of Chicago*, 302 Ill. App. 3d at 49, 706 N.E.2d at 920 (quoting Restatement (Second) of Agency § 229 cmt. b, at 508). According to United

States Attorney's logic, the Navy personnel at Pearl Harbor acted outside the scope of their employment in responding to the Japanese attack on December 7, 1941 because the United States government did not anticipate that they would encounter enemy combatants on that date. Of course, that is nonsense, and today we honor those veterans for their bravery and service, even though the United States was not at war with the Imperial Government of Japan until the next day. Pub. Law 77-328, 55 Stat. Pt. I, p. 795 (Dec. 8, 1941). The same is true here. While at the Great Lakes Naval Base Hospital gym, either to train others or to maintain his own physical fitness level, Hill suffered from the delusion that an enemy of the United States – a Somali warlord who had declared war on the United States, and was an enemy of this country – was there to kill him. (Hill Affidavit [Exhibit F] ¶ 17; Hill dep. [Exhibit G] at 49, 83-84). Hill's SEAL training was to response to such a threat with force, even if he was in the hospital. (Hill dep [Exhibit G] at 30, 59-60, 63-64, 71-72). This Court should hold that Hill was engaged in the type of work the Navy trained and employed him to do, and overturn the United States Attorney's decision.

**3.    The Navy Trained Hill To "Aggress" This Country's Enemies Wherever Found**

This Court should overturn the United States Attorney's decision that Kirk Hill acted outside the scope of his Navy SEAL employment because the United States Attorney applied the wrong standard for deciding whether Hill's conduct occurred substantially within time and space limitations. Under Illinois law, "The next question is whether the conduct occurred 'substantially within the authorized time and space limits' of the employment." *Gaffney v. City of Chicago*, 302 Ill. App. 3d at 51, 706 N.E.2d at 921. Although the United States Attorney did not analyze this factor individually, he commented that Cmdr. Hill "was transferred in a temporary duty status to Great Lakes Naval Hospital for treatment, not for combat."(Thomas F. Walsh letter to M.H.

Anderson, Captain, U.S. Navy Medical Corps [Exhibit D] at 2). Implicit in the United States Attorney's observation is his belief that Navy SEALs are only authorized to exercise military powers when overseas and tasked with a "Real World Mission."

This Court must reject the district court's holding that Hill's services as a Navy SEAL were restricted to those instances when the Navy deployed him in a Real World Mission outside the United States, because it is inconsistent with Illinois scope-of-employment jurisprudence for four reasons. First, Illinois courts recognize that some employees' unique duties – such as police officers – require them to be on duty on a 24/7 basis. *Adames v. Sheahan*, No. 01-05-3911, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2007 WL 2984077 *at* * ____ (deputy sheriff owned firearm for work purposes, which he store at home); *Gaffney v. City of Chicago*., 302 Ill. App. 3d at 51, 706 N.E.2d at 921; *Brown v. King,* 328 Ill. App. 3d 717, 721, 767 N.E.2d 357, 360-61 (1 st Dist. 2001); *see* Restatement (Second) of Agency § 233, cmt. c, at 517 ("Although the servant has regular hours of employment, he may be upon call at other hours .... If so, and if he performs his duties negligently, the employer is responsible.") Military members are also unique in this way. Hill testified without contradiction that the Navy trained him to be a SEAL, first and foremost, and that under that training, his instincts were to aggress enemy combatants no matter where he encountered them. (Hill dep. [Exhibit G] at 38-39, 41-43, 45, 63-64). In pleadings filed thus far, the government has offered no contrary testimony from Hill's superior officers or anyone from the Department of Defense or the United States Navy challenging Hill's testimony that Navy SEALs have a continuing 24 hours per day/7 days per week duty to defend this country. As a result, the United States Attorney court failed to recognize that Navy SEAL employment is a unique work environment. Thus, it should not have mattered that this military member's delusional use of violence against a perceived enemy of the

United States occurred when he was not on an assigned combat mission.

Second, Hill testified – again, without contradiction – that when he encountered Foster, he had no idea where he actually was, whether he was in North Chicago, Illinois or Somalia. To Hill, he thought he was dealing with a Somali warlord there to kill him, and under his SEAL training, he instinctively "aggressed" that individual. (Hill dep. [Exhibit G] at 61-63).  Therefore, the fact that Hill in fact was at the Great Lakes Naval Base Hospital should not remove him from acting within the scope of his federal employment. Therefore, this Court should hold that Hill's physical fitness activities at the Navy gym were substantially within the authorized time and space limits of his Navy employment, and overturn the United States Attorney's court's decision.

### 4.    Hill's Conduct Was Motivated By His Desire To Serve The Navy

This Court should reverse the United States Attorney's decision that Kirk Hill acted outside the scope of his Navy SEAL employment because Hill's conduct was motivated by his desire to serve his employer, and was not based on a personal vendetta or ill will towards Foster.  The third scope factor is that the employee's conduct be motivated, at least in part, by a desire to serve the master. "[T]his factor in *respondeat superior* analysis is satisfied so long as the employee is motivated in part by a desire to serve the employer, even if the employee is also motivated by personal considerations."  *Gaffney v. City of Chicago*, 302 Ill. App. 3d at 54, 706 N.E.2d at 923. Here, United States Attorney conceded that Hill satisfied this factor because he believed Foster was a Somali warlord there to kill.

Although no Illinois court has specifically addressed whether an employer is liable on a *respondeat superior* basis for the intentional torts of an insane, delusional, or paranoid employee, the United States Court of Appeals for the Seventh Circuit in *Graham v. Sauk Prairie Police*

9

*Comm'n*, 915 F.2d 1085 (7th Cir. 1990), applied Wisconsin law and held that an insane police officer acted within the scope of his employment when he shot and killed an unarmed, non-threatening individual.  There, Officer Mueller, an on-duty police officer, responded to a Game Warden's request for assistance about a suspect believed to possess controlled substances, and assisted the Game Warden in arresting Graham, placing his hands behind his back, and handcuffing him. Officer Mueller then drew his service revolver, and fired two shots into Graham's head, killing him.  According to the Seventh Circuit, "It is undisputed that Graham was not fleeing and posed no threat of death or serious injury to Mueller or any other person at the time of the shooting. Also undisputed is the fact that Mueller was suffering from chronic paranoid schizophrenia at the time he shot Graham." *Id.* at 1088. The court further elaborated on Mueller's insanity, noting that he suffered delusions and was completely out of touch with reality:

> It is undisputed that at the time Mueller shot Graham, Mueller was suffering from an acute exacerbation of a condition known as "schizophrenia, chronic paranoid reaction." The acute exacerbation resulted from Mueller's failure to comply with the prescribed use of his medication; this in turn caused Mueller's thoughts to become disorganized, caused him to have delusions about being threatened and resulted in periods of agitation. At the time he shot Graham, Mueller had become psychotic, lost contact with reality and was incapable of exercising reasonable judgment in the use of his weapon.

*Id.* at 1096.

Under the applicable Wisconsin indemnification statute, the city was required to indemnify judgments entered against officer Mueller if he was acting within the scope of his employment, which Wisconsin courts defined as the employee being "motivated, at least in part, by a purpose to serve his employer." *Id.* at 1094 (citing *Olson v. Connerly*, 457 N.W.2d 479, 482-83 (Wis. 1990)). Chief of Police Rentmeester testified that police officers were taught not to use deadly force unless an officer's or other's life was at risk, and that the department's objective was not to deprive suspects

of their opportunity to appear and defend themselves in criminal prosecutions. *Id.* at 1094.

In holding that officer Mueller acted within the scope of his employment in shooting an unarmed, non-threatening, handcuffed suspect, the Seventh Circuit focused on the fact that he was activated by a desire to serve his master – rather than venting some personal animus at Graham – and that he was performing the services anticipated of a police officer, which may include the use of deadly force:

> If a jury could have inferred that Mueller shot Graham because of a private feud between them, a jury might reasonably conclude that Mueller was acting solely for his personal benefit ... and thus, he acted outside the scope of his employment. ... However, the facts do not suggest any private connection between Mueller and Graham. Likewise, if Mueller shot Graham while he was off-duty cruising the streets and instigating fights with motorists and pedestrians ..., a jury might reasonably conclude that he acted outside the scope of his employment. However, at the time Mueller shot and killed Graham, he was an on-duty, uniformed police officer. Moments prior to the fateful event, he was operating a patrol car in his jurisdiction. Mueller pursued Graham only as a result of a call for assistance he received over his patrol car radio. Arriving at Graham's residence, Mueller and a conservation warden assisted each other in handcuffing Graham moments before Mueller shot him in the head. Given these facts, we do not believe a jury could reasonably conclude that Mueller's conduct was "too little activated by a purpose to serve [his] employer" or that his conduct was "motivated entirely by [his] own purposes."

> *            *            *

> Rentmeester's affidavit merely establishes that Mueller's use of deadly force was improper under the circumstances: the affidavit does not establish that Mueller's shooting was disconnected from the type of services ordinarily contemplated by a police officer. Our focus must be on the nature of the services contemplated, not the outcome of the employee's acts. The use of deadly force incidental to arrest is a recognized and accepted tool of policing. Merely because Mueller misused his authority to use deadly force in apprehending Graham does not put him outside the scope of his employment. A logical application of a rule focusing on outcome is that any unauthorized use of deadly force by a police officer is outside the scope of employment. Here, ..., Mueller's shooting was unquestionably a method, even though quite an improper one, of carrying out the objectives of his employment.

*Id.* at 1095.

11

Applying this factor, it is undisputed that at the time of Hill's assault of Foster, he believed that he was facing a Somali warlord there to kill him. (Hill Affidavit [Exhibit F] ¶ 17; R. 29 [Exhibit 1] Hill dep. at 49, 83-84). Focusing on the "nature of the services contemplated," Hill performed exactly the kind of services the Navy trained its SEALs to do: defend themselves against enemy combatants. *See Major Alan G. Hendrickson, Somalia: Strategic Failures And Operational Successes*, <http://www.globalsecurity.org/military/library/report/1995/HAG.htm ch. 6 (April 1995)> (United Nations forces launched an "unprecedented and unsuccessful five month manhunt" for Aidid). Hill and Foster did not work or socialize together, did not have an altercation or argument or any type of ill will towards each other, and did not even know each other before the attack. They did not even participate in the same basketball game before the attack, and thus did not have any interaction there which might have lead to personal resentments. (United States Response [Exhibit H] at 0062, 0065, 0076, 0089, 0091, 0108). Witnesses confirmed that Hill was "very composed and calm" and did not appear angry within the minutes preceding him attacking Foster. *Id*. at 0065, 0072. Because Hill was advancing the interests of the United States Navy and not pursuing his own personal interests, this Court should hold that he acted within the scope of his SEAL employment, and overturn the United States Attorney's decision that Hill acted outside the scope of his federal employment.

**5.    Hill's Use Of Intentional Force Against Third Parties Was Not "Unexpectable"**

Finally, the United States Attorney insisted – without elaboration – that Hill acted outside the scope of his Navy SEAL employment because his intentional use of force was "unexpectable" *See* Restatement (Second) of Agency § 228(1)(d), at 504 (1958). Apparently, the United States Attorney's position was that Hill's resort to his Navy SEAL training and instincts in the face of

perceived aggression by a Somali warlord was unexpectable because the Navy did not authorize him

to use force while on temporary assignment. This is not the correct standard under Illinois law.

Under Section 245 of the Restatement of Agency, "A master is subject to liability for the

intended tortious harm by a servant to the person ... of another by an act done in connection with the

servant's employment, although the act was unauthorized, if the act was not unexpectable in view

of the duties of the servant." Restatement (Second) of Agency § 245, at 537 (1958); *see Harrington*

*v. Chicago Sun-Times*, 150 Ill. App. 3d 797, 802, 502 N.E.2d 332, 335 (1st Dist. 1986). Under the

comments to that Restatement, a master cannot insulate itself from responsibility for employees'

conduct merely by prohibiting them from exerting force:

> To create liability for a battery by a servant upon a third person, the employment
> must be one which is likely to bring the servant into conflict with others. ... [T]he
> employment of servants to guard or recapture property, to take possession of and, or
> to deal with chattels which are in the possession of another, is likely to lead to
> altercations, and the master may become liable, in spite of instructions that no force
> shall be exerted against the person of the possessor.

Restatement (Second) of Agency § 245, cmt. c, at 539 (1958).

Kirk Hill's job predictably entailed the use of force. *See Jones v. Patrick & Assoc. Detective*

*Agency, Inc.*, 442 F.3d 533, 536 (7 th Cir. 2006). The United States Navy trained Hill to be a Navy

SEAL, and to "aggress" and kill enemy combatants. (Hill dep. [Exhibit G] at 38-39, 41-43, 73-74,

76-77). Thus, the Navy should have expected that Hill was capable of implementing the training it

had instilled in him. The fact that the Navy assigned him to a Temporary Assigned Duty to assist the

Physical Readiness Coordinator – or did not specifically tell him that the Rules of Engagement

applied at the Great Lakes Naval Base Hospital – does not mean that Hill's assaulting Foster was

unexpected; it simply means that his act was not expressly authorized, which does not remove it

from Hill's scope of employment. Similarly, the fact that the Navy did not issue Hill a firearm at

the Great Lakes Naval Base has no bearing on whether it was expectable that he would intentionally

13

use force; the Navy trained Hill to *be* a human weapon, capable of killing the enemy with hand-to-hand combat or weapons that were not firearms. (Hill dep. [Exhibit G] at 80-81). This Court should overturn the United State's Attorney's scope decision, and hold that Kirk Hill acted within the scope of his federal employment.

WHEREFORE, Defendant Kirk Hill respectfully requests this Court to enter an order: (1) certifying that he acted within the scope of his federal employment as a Navy SEAL member on March 5, 2002; (2) striking the scope certification issued by the United States Attorney for the Northern District of Illinois; and (3) substituting the United States of America as the sole defendant in this action.

Respectfully submitted,

STELLATO & SCHWARTZ, LTD.

By: _____
David S. Allen

30707
Steven B. Borkan
David S. Allen
STELLATO & SCHWARTZ, LTD.
Attorneys for Defendant/Petitioner Kirk L. Hill
120 N. La Salle Street
34th Floor
Chicago, Illinois 60602
(312) 419-1011

14

30707         12/3/07         SBB:dsa         WHITE         15689-9-73

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

JAMES HALL FOSTER,                    )
                                       )
          Plaintiff,                   )
                                       )
vs.                                    )     No.:  04 L 180
                                       )
KIRK L. HILL,                          )
                                       )
          Defendant/Petitioner,        )
                                       )
vs.                                    )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
          Respondent.                  )

## DEFENDANT/PETITIONER KIRK L. HILL'S RENEWED PETITION TO
## FIND AND CERTIFY THAT HE ACTED WITHIN THE SCOPE OF
## HIS FEDERAL EMPLOYMENT AND SUBSTITUTE THE
## UNITED STATES OF AMERICA AS THE SOLE DEFENDANT

NOW COMES Defendant/Petitioner, Kirk L. Hill, by and through his attorneys, Stellato &

Schwartz, Ltd., under the Federal Employees Liability and Reform Tort Compensation Act of 1988

(the "Westfall Act"), Public Law 100-694, 28 U.S.C. § 2679(d)(3), and renews requests this Court

to: (1) certify that he acted within the scope of his federal employment as a United States Navy

SEAL member on March 5, 2002; (2) strike the scope certification issued by the United States

Attorney for the Northern District of Illinois; and (3) substitute the United States of America as the

sole defendant in this action.  In support thereof, defendant states as follows:

## I.    INTRODUCTION

1.      Plaintiff James Hall Foster's lawsuit against defendant Hill arises out of Hill's alleged

attack upon Foster on March 5, 2002 at the Great Lakes Naval Base in Great Lakes, Illinois.

2.     On March 1, 2004, Foster filed a complaint against Hill in the Circuit Court of the Nineteenth Judicial Circuit in Lake County, Illinois, alleging an unprovoked willful, malicious and intentional assault and battery on March 5, 2002.

3.     On March 2, 2005, Foster filed an Amended Complaint against Hill in the Circuit Court of the Nineteenth Judicial Circuit in Lake County, Illinois, this time only alleging that Hill's attacking him resulted from Hill's negligent failure to take medication needed to control his emotional condition, and negligent failure to seek medical care for that condition.

4.     On March 22, 2005, Hill filed his answer, affirmative defenses, and jury demand in response to Foster's Amended Complaint.

5.     Defendant/Petitioner Kirk Hill attaches and incorporates by reference the following exhibits in support of this Petition, including:

| Exhibit | Description |
|---------|-------------|
| A | Plaintiff's Complaint at Law, filed March 1, 2004 |
| B | Plaintiff's Amended Complaint at Law, filed March 2, 2005 |
| C | Defendant's Answer and Affirmative Defenses, filed March 22, 2005 |
| D | United States Attorney for the Northern District of Illinois refusal to certify that Defendant Hill acted within the scope of his Navy employment on March 5, 2002, during his alleged attack upon Plaintiff Foster, dated June 27, 2005. |
| E | Memorandum Opinion and Order of the United States District Court for the Northern District of Illinois, entered May 18, 2006 |
| F | Affidavit of Kirk L. Hill |
| G | Deposition of Kirk L. Hill |
| H | Response of the United States, consisting of the NCIS investigation |

2

## II.   SCOPE-OF-EMPLOYMENT DECISIONS UNDER THE WESTFALL ACT

6.      Under the Westfall Act, the Attorney General may certify that a federal employee named as a defendant in a civil lawsuit was "acting within the scope of his office or employment at the time of the incident" that serves as the basis for a tort claim against that employee.  28 U.S.C. § 2679(d)(1).[1]  (The Attorney General delegated the authority to make such scope-of-employment certifications to the United States Attorneys regarding civil actions brought against federal employees in their respective districts. *See* 28 C.F.R. § 15.3(a)(1997)).

7.      If the Attorney General's certification stands, the defendant federal employee is immune from suit on claims arising from certified conduct, and the United States is substituted as the defendant with regard to those claims. 28 U.S.C. §§ 2679(b)(1), (d)(1).

8.      However, if the Attorney General refuses to certify federal employees were acting within the scope of their employment, those employees may challenge the Attorney General's scope certification at "any time before trial" by filing a petition with the court where the action is pending to review that decision. 28 U.S.C. § 2679(d)(3). If the court overturns the Attorney General's "scope" decision and substitutes the United States as the defendant, the remedy against the United States is the exclusive remedy and any other action – specifically, any action against the individual employee/defendant in his individual capacity – is precluded.  28 U.S.C. § 2679(d)(1).

9.      The  Attorney General's Westfall Act scope-of-employment certification decisions are subject to judicial review.  *Gutierrez v. de Martinez v. LaMagno*, 515 U.S. 417 (1995).  The

---

[1]      The Federal Employees Liability and Reform Tort Compensation Act of 1988, Public Law 100-694, is referred to as the "Westfall Act" because it overrules the United States Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), that federal employees were not immune from personal liability for actions taken in the course and scope of their employment unless their actions were discretionary.

3

burden of proof is on the party challenging the Attorney General's scope certification.    *Day v. Massachusetts Air Nat'l Guard*, 167 F.3d 678, 685-687 (1st Cir. 1999); *Lyons v. Brown*, 158 F.3d 605, 610-611 (1st Cir. 1998).   The Court's scope of review is *de novo*, and the Attorney General's scope decision is entitled to no deference whatsoever. *Hamrick v. Franklin*, 931 F.2d 1209, 1211 (7th Cir. 1991); *Wedbee v. United States*, 352 F. Supp. 2d 618, 626 (M.D. N.C. 2005); *Lee v. United States*, 171 F. Supp. 566, 573 (M.D. N.C. 2001).

10.    Under the Westfall Act, the court decides the facts relating to the scope-of-employment question without a jury, even if state law would otherwise provide for a jury trial on the issue. *Gutierrez de Martinez v. Drug Enforcement Admin.*, 111 F.3d 1148, 1153 (4th Cir. 1997); *Webb v. United States*, 24 F. Supp.2d 608, 614 (W.D. Va. 1998).

### III. STATEMENT OF FACTS

**A.    Kirk Hill's Navy SEAL Training And Employment**

11.    After enlisting in the United States Navy in 1984 at the age of 19, Kirk L. Hill trained to become and was accepted as a member of a United States Navy SEAL team in 1988, and served as a SEAL team member from 1988 through 2003. (Kirk L. Hill Affidavit [Exhibit F] ¶¶ 2, 4, 21; Hill dep. [Exhibit G] at 71).   "SEAL" stands for "SEa Air & Land," and SEAL units are the Navy's version of Special Forces, trained to engage in unconventional warfare (guerilla, desert, jungle, and winter warfare) in various countries. (Hill dep. [Exhibit G] at 71). According to Hill's deposition testimony, the Navy trained him to be a SEAL at all times and under all circumstances. (Hill dep. [Exhibit G] at 38-39, 41-43, 45, 71-72).   That meant that his overriding mission was to defend this country against enemy combatants, whether he encountered them in a foreign nation or within the United States. (Hill dep. [Exhibit G] at 38-39, 41-43, 73-74, 76-77).

4

12.     To carry out his mission as a SEAL, Hill was proficient in using a car-15 (a version of an M16) with a 203 grenade launcher, a 1911 A-1 .45 (a .45 caliber pistol), and hand-to-hand combat; to the Navy, the fact that Hill had no firearm was no excuse for him to shirk engaging an enemy. (Hill dep. [Exhibit G] at 22-23, 80-81).

13.     In his 20 years as a SEAL, Hill served in approximately 67 "Real World Missions," defended this country in three wartime deployments in Operations Desert Shield and Desert Storm, Somalia, and Bosnia, and was a highly decorated veteran.  (Hill Affidavit [Exhibit F] ¶¶ 5-8; Hill dep. [Exhibit G] at 9-10).  A "Real World Mission" is a military task for the SEAL platoon to accomplish, such as removing war criminals from Bosnia and leading sniper teams in Mogadishu, Somalia, and involved constant danger and sometimes daily fire fights. (Hill Affidavit [Exhibit F] ¶ 6; Hill dep. [Exhibit G] at 13).  A SEAL platoon is 16-18 men with four leaders that can break down to 4-5 man fire teams or 2-4 man sniper teams. (Hill dep. [Exhibit G] at 16).

14.     When SEAL units were "tasked" with a mission, their "Rules of Engagement" were established, and the platoon units determined what they needed to accomplish based on available intelligence. (Hill dep. [Exhibit G] at 13).  "Tasking a mission" involved the General in the military theater delegating assignments to the lower echelon commanders, which assignments would be "briefed" to the individual units. (Hill dep. [Exhibit G] at 14). SEAL platoons were briefed in oral presentations from various sources, including CIA operatives, Army intelligence officers, or outgoing platoons. (Hill dep. [Exhibit G] at 14-15).  A "Rule of Engagement" is the law or guidance that SEAL platoons receive for when they can engage and potentially kill enemy combatants. (Hill dep. [Exhibit G] at 78).  Essentially, the Rules of Engagement provided that if Hill or his men were fired upon or threatened in any way, shape, or form, they could engage and kill the enemy. (Hill dep.

[Exhibit G] at 18, 31-32). Although the Rules of Engagement "typically deal with real-world missions and combat zones" in foreign countries, they would apply equally in the United States if the Navy was at war or felt it was at war in the United States. (Hill dep. [Exhibit G] at 30, 59-60, 63-64). As Hill testified, "All my training, I'm always focused on combat. I can't get rid of it. It's instilled in me. So, if I was to come across an enemy combatant right out here on the street, I'd probably aggress that individual as violently as I could if I thought he was a detriment to our country." (Hill dep. [Exhibit G] at 45).

**B.    Hill's Somalia Deployment**

15.    In the early 1990's, the United Nations intervened militarily in Somalia and met resistance in its attempt to feed the Somali people and begin building a democratic nation. (Hill dep. [Exhibit G] at 72-73). Between October 1993 and February 1994, Hill's SEAL platoon was deployed with the United States Marines in Somalia. (Hill Affidavit [Exhibit F] ¶ 5; Hill dep. [Exhibit G] at 7). After his assignment began, Hill became familiar with the clan system within Mogadishu, Somalia, including an Islamic clan headed by General Mohammed Farrah Aidid, the primary warlord in charge of that clan. (Hill dep. [Exhibit G] at 73). Hill knew that General Aidid had declared war on the United States, and thus became a threat to the United States and a target to be killed, if encountered. (Hill dep. [Exhibit G] at 7, 73-74).

16.    While in Somalia, Hill was assigned on a "Real World Mission," with two responsibilities: (1) protecting United Nations forces within Mogadishu by engaging the enemy as a sniper; and (2) intelligence gathering on known enemy positions. (Hill dep. [Exhibit G] at 11-12). While in Mogadishu, Hill worked independently without guidance from an Officer In Charge ("OIC"); Hill was the one in charge of a four-man sniper team and responsible for their lives, his life,

and carrying out the mission. (Hill dep. [Exhibit G] at 16-17). According to Hill, the Rules of Engagement for Somalia were that the SEAL units could "aggress and neutralize" the enemy without a superior officer's order if they were fired upon or engaged, or felt threatened in any way, shape, or form, or if the enemy had counter-sniper operators, RPG personnel, or carried a crew serve weapon. (Hill Affidavit [Exhibit F] ¶ 18; Hill dep. [Exhibit G] at 17, 24-25, 30-31).

**C.    Hill Returns To The United States And Experiences Delusions**

17.    After 13 years of "straight sea time" (under constant deployment from one SEAL assignment to another), in September 2000, Hill returned to the Naval Personnel Command in Millington, Tennessee to pursue a career advancement opportunity to "make rank," and advance from Chief to Master Chief. (Hill Affidavit [Exhibit F] ¶ 9; Hill dep. [Exhibit G] at 33-34). His assignment at the Naval Personnel Command was SEAL detailer, which meant he wrote orders for medics and Basic Underwater Demolition ("BUD") SEAL graduates. (Hill dep. [Exhibit G] at 33). His superiors at Naval Personnel Command were Lieutenant Commander Chapman, and Master Chief Rick Culley. (Hill Affidavit [Exhibit F] ¶ 10; Hill dep. [Exhibit G] at 34). While there, the Navy did not issue Hill any firearms. (Hill dep. [Exhibit G] at 34).

18.    In July 2001, Hill started experiencing delusions about an "insurgence" of SEAL Team members from the West Coast trying to infiltrate the East Coast SEAL Teams, and that his immediate supervisor, Master Chief Culley, was a central figure; Hill's delusions were accompanied by aberrant behavior, such as threatening Master Chief Culley without provocation, accusing Culley of working for a "big mafia boss" controlling the "special warfare universe," and accusing Culley and a Petty Officer of injecting poison into a Taco Bell taco they bought him. (Hill Affidavit [Exhibit F] ¶¶ 10-13; Hill dep. [Exhibit G] at 35). On September 24, 2001, Master Chief Culley took

7

Hill to see a psychiatrist.  (Hill Affidavit [Exhibit F] ¶ 13).

19.     On September 24, 2001, Hill approached Master Chief Culley while the Master Chief was in his work cubicle, and put him in a choke hold.  (Hill Affidavit [Exhibit F] ¶¶ 10-13; Hill dep. [Exhibit G] at 35).  Military police discovered that Hill had a 14-inch lead pipe and a Spyderco knife with him when he attacked Culley. (Hill Affidavit [Exhibit F] ¶ 14; Hill dep. [Exhibit G] at 34-35).

**D.      Hill Is Assigned To Great Lakes Naval Base Hospital**

20.     As the result of this incident with Master Chief Culley, the Navy sent Hill to Great Lakes Naval Base Hospital for evaluation. (Hill dep. [Exhibit G] at 36-37). Hill was initially treated on an in-patient basis from September 2001 to January 2002, and then on an out-patient basis beginning in January 2002.  (Hill Affidavit [Exhibit F] ¶ 15; Hill dep. [Exhibit G] at 37-38, 58).

21.     As part of his out-patient treatment plan, Hill's doctor and social worker assigned him to "Temporary Assigned Duty" ("TAD") at the Great Lakes Naval Base gym to assist the Physical Readiness Coordinator once per week to assist or lead some form of physical training, in addition to going to the hospital on an out-patient basis. (Hill Affidavit [Exhibit F] ¶ 15; Hill dep. [Exhibit G] at 47-48, 68-69).  From Hill's understanding, he was allowed to be treated on an out-patient basis because he was doing everything his doctor and social worker asked him to do. (Hill dep. [Exhibit G] at 38).  Although the Navy assigned Hill to Temporary Assigned Duty, Hill testified that as a SEAL, if he saw an enemy combatant, his training and instincts were to "aggress" that individual. (Hill Affidavit [Exhibit F] ¶ 15; Hill dep. [Exhibit G] at 38-39, 41-43).  Serving as a Physical Readiness Coordinator was not a new assignment for Hill: he had performed those duties incident to his duties as a SEAL on active duty.  (Hill Affidavit [Exhibit F] ¶ 15).

**E.    Hill "Aggresses" An Individual He Believes Is Somali Warlord General Aidid**

22.    According to his work schedule for physical fitness sessions, on March 5, 2002, Hill was scheduled to be at the Great Lakes Naval Base gym at 1300 (1:00 p.m). (Hill dep. [Exhibit G] at 46-47). Although he cannot recall the exact time that he arrived at the gym that day, Hill testified in his deposition that he was "pretty punctual" about arriving 30-60 minutes before he was to start work. (Hill dep. [Exhibit G] at 50-52).

23.    What happened on March 5, 2002 when Hill encountered James Hall Foster can only be understood with the perspective of hindsight, by looking through the prism of what the Bureau of Prisons Board of Psychiatrists' evaluation revealed after the fact: on that date, Hill was "insane" when he encountered Foster. (United States Response [Exhibit H] at 0125). Foster was at the gym that day because he worked as a civilian employee for the Navy Drug Screening Laboratory at the Great Lakes Naval Base Hospital, and worked out at the gym on a regular basis. (United States Response [Exhibit H] at 0076, 0108). Hill does not know Foster, and would not recognize him now if they were to encounter each other. (Hill Affidavit [Exhibit F] ¶ 16; Hill dep. [Exhibit G] at 52).

24.    But on March 5, 2002, when Hill saw Foster, he thought he was Somali warlord, General Aidid, believed that "Aidid" was there to kill him, and feared for his life. (Hill Affidavit [Exhibit F] ¶ 17; Hill dep. [Exhibit G] at 49, 83-84). Hill had seen pictures of General Aidid while stationed in Somalia. (Hill dep. [Exhibit G] at 65). Because he believed Foster was a Somali warlord there to kill him, Hill believed that the Rules of Engagement for Somalia were in play. (Hill Affidavit [Exhibit G] ¶ 18; Hill dep. [Exhibit G] at 49, 52-53, 61-62). He did not realize where he actually was, or that he was actually in North Chicago, Illinois. (Hill dep. [Exhibit G] at 63, 87-88).

25.    Hill does not recall exactly what Foster was doing immediately before he "aggressed"

9

him, how he "aggressed" Foster, or what time the incident occurred. (Hill dep. [Exhibit G] at 64-66, 67-68). According to the witnesses that were present in the Great Lakes Naval Base gym (Mark Dillender and Theodore Runnels), at approximately 1200 (12:00 p.m.), Hill participated in a basketball game, and then lifted weights; Foster did not play basketball with Hill. (United States Response [Exhibit H] at 0062, 0089). Witness Elijah Rahman then saw Hill remove a metal weight bar from a weight-lifting machine, and return that bar shortly thereafter; witnesses observed that Hill was "very composed and calm" and did not appear angry. *Id.* at 0065, 0074. Other witnesses saw Hill hiding the bar, and then "flip" it and strike Foster. (Hill Affidavit [Exhibit F] ¶ 19; United States Response [Exhibit H] at 0063, 0072). All witnesses and Foster agreed that there had not been any fight or altercation between Foster and Hill before the attack. (United States Response [Exhibit H] at 0065, 0076, 0091, 0108).

26.     As the result of this incident, Hill was arrested by the Naval Criminal Investigative Service and the county sheriff. (Hill Affidavit [Exhibit F] ¶ 19; Hill dep. [Exhibit G] at 54-55). The Navy charged Hill with two counts of aggravated assault for the incidents with Master Chief Culley and James Foster, but dismissed those charges based on Hill's mental condition at the time of the crimes. (Hill Affidavit [Exhibit F] ¶ 21; Hill dep. [Exhibit G] at 54-55).

## IV.  PROCEDURAL HISTORY

27.     In response to the Navy's request that the United States Attorney certify that Kirk Hill acted within the scope of his federal employment and that the United States be substituted as a defendant in Foster's in this lawsuit on June 27, 2005, the United States Attorney declined to certify that Hill acted within the scope of his federal employment. (Thomas F. Walsh letter to M.H. Anderson, Captain, U.S. Navy Medical Corps [Exhibit D].). Although assuming that Hill satisfied

10

the third scope-of-employment factor – that Hill's conduct was actuated by a purpose to serve his

employer – the United States Attorney concluded that Hill did not meet the three remaining scope

factors:

> The first, third and fourth factors do not appear applicable to Mr. Hill's conduct. (We assume for the sake of argument that the third factor could be satisfied). Although Mr. Hill had been a seasoned member of the U.S. Navy's elite special forces for years, once he was diagnosed with serious mental problems following an attack on an officer in Tennessee, he was transferred in a temporary duty status to Great Lakes Naval Hospital for treatment, not for combat. It was only because of Mr. Hill's apparent progress in his therapy that he had earned the privilege of working at the gym during his continuing treatment. Assuming that Mr. Hill thought he was attacking an enemy of the United States or a rogue faction of the SEALs in the gym locker room, it does not appear that his actions were "of the kind he was employed to perform" at the time in his temporary duty status. Likewise, we think that it was unexpectable to the Navy that as part of Mr. Hill's duties at the time that he would use any force against anyone.

(Thomas F. Walsh letter to M.H. Anderson, Captain, U.S. Navy Medical Corps [Exhibit D] at 1-2).

28.     While the United States Attorney acknowledged that *Graham v. Sauk Prairie Police*

*Comm'n.*, 915 F.2d 1085 (7th Cir. 1990), "at first blush would seem to support the notion that Mr.

Hill could have been acting in the scope of his employment," the United States Attorney attempted

to distinguish *Graham*.   In that case, the Seventh Circuit held that a delusional municipal police

officer – who shot a unarmed, handcuffed detainee – acted within the scope of his employment:

> In contrast to the situation in *Graham*, Mr. Hill was far removed from any reasonable combat situation while on temporary detail for psychiatric treatment to Great Lakes Hospital. It is possible to imagine a scenario under which Mr. Hill might have been expected to react to a perceived threat with violence, but the exercise requires so much imagination that it would be difficult to say that the [*sic*] a[t] the time of the attack, Mr. Hill was engaged in the kind of action he was employed to perform or that the use of force was expectable. According to the court in *Graham*, the "focus must be on the nature of the services contemplated" (*id.*), and it is simply too much of a stretch to conclude that Mr. Hill's locker-room actions while in that temporary duty status were of the kind that were contemplated.

11

(Thomas F. Walsh letter to M.H. Anderson, Captain, U.S. Navy Medical Corps [Exhibit D] at 2).

29.     On October 21, 2005, Hill filed a Petition with this Court, challenging the United States Attorney's "scope" decision, and requested that this Court: (1) find and certify that he acted within the scope of his federal employment as a Navy SEAL member; (2) strike the United States Attorney's scope certification decision; and (3) substitute the United States as the sole defendant in this action.

30.     On October 26, 2005, the United States removed Hill's Petition to the United States District Court for the Northern District of Illinois, as is permitted under 28 U.S.C. § 2679(d)(3), which provides:

> (3) In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. .... In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending. If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.

28 U.S.C. § 2679(d)(3).

31.     The United States's removal Petition completely divested this Court of subject matter jurisdiction to hear and decide the merits of this case, until the federal court re-invested this Court with jurisdiction. *Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 155, 601 N.E.2d 720, 725-26 (1992); *Eastern v. Canty*, 75 Ill.2d 566, 571, 389 N.E.2d 1160, 1162 (1979); *Illinois Licensed Beverage Assoc., Inc. v. Advanta Leasing Serv.*, 333 Ill. App. 3d 927, 932-33, 776 N.E.2d 255, 260 (4th Dist.

12

2002).

32.    On May 19, 2006, the United States District Court for the Northern District of Illinois entered a Memorandum Opinion and Order denying Hill's Petition because the court lacked subject matter jurisdiction, dismissed the United States, and remanded this case back to this Court. [Exhibit E].

33.    On May 17, 2006, the Clerk of the United States District Court for the Northern District of Illinois issued a Certified Letter with the federal district court's Remand Order. However, on June 14, 2006, Hill filed a timely Notice of Appeal to the United States Court of Appeals for the Seventh Circuit.

34.    On August 13, 2007, the United States Court of Appeals for the Seventh Circuit dismissed Hill's appeal for lack of appellate jurisdiction. *Foster v. Hill*, 497 F.3d 695 (7th Cir. 2007). The Seventh Circuit recognized that "[a]t the time that this case was briefed and argued, it was assumed that courts of appeal had jurisdiction to hear appeals from denials of Westfall Act immunity." *Id*. at 697.  However, the Seventh Circuit held that the intervening decision of *Daniels v. Liberty Mut. Ins. Co.*, 484 F.3d 884 (7th Cir. 2007), called into question the continued validity of that "assumption." *Foster v. Hill*, 497 F.3d at 698.

35.    Although the Seventh Circuit dismissed Hill's appeal, the court noted the case's "odd procedural posture" because collateral estoppel cannot bar Hill from litigating whether he acted within the scope of his federal employment:

> We are well aware of the odd procedural posture that this result will create as the case goes forward. The case will now return to state court. But because the parties have been prevented by statute from any appellate review of the district court's scope of employment decision, issue preclusion cannot be invoked in the state court on the question of whether Hill was acting within the scope of his employment when he attacked Foster. *See Kircher v. Putnam Funds Trust*, ___ U.S. ___, 126 S.Ct. 2145,

2156-57 , 165 L.Ed.2d 92 (2006)("[W]hat a state court could do in the first place it may also do on remand .... Collateral estoppel should be no bar to such a revisitation of the ... issue, given that § 1447(d) prevents the funds from appealing the District Court's decision."); see also RESTATEMENT (SECOND) OF JUDGMENTS § 28(1)(2007)("[R]elitigation of the issue in a subsequent action between the parties is not precluded [when t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.") As we recently reminded the defendant in *Daniels*, any argument that might have been made on appeal in this court can now be made in the state court on remand. *Daniels*, 484 F.3d at 888.

The nearly two years that this case has been pending in various federal courts are, in many meaningful aspects, a nullity.  Congress has precluded this court from considering any appeal of a remand based on lack of subject matter jurisdiction.  Our circuit precedent in Daniels establishes that when the Attorney General declines to certify that actions were within the scope of federal employment and the district court remands the case without clarifying the grounds for the remand, then the remand must be presumed by this court to be based on lack of subject matter jurisdiction.  The case now returns to the Illinois courts where the state judge is not precluded from re-considering whether Hill's actions were within the scope of his employment.  Of course, if the state court disagrees with the district court's findings, the United States will be substituted (again) and the United States can invoke removal to the federal courts (again).  This, of course, seems odd.

In the interim, a federal employee will now resume defending litigation even though there is a chance that the Westfall Act purports to grant him immunity from suit.  If we were permitted to consider that claim of immunity, the question could be settled once and for all. But whether this defendant should be immune from suit is a question that Congress and our circuit precedent prevent us from even considering.  Meanwhile, the plaintiff has waited five years for a legal remedy, which today is no closer than it was in 2005 when the case was first removed to the district court. As a recent concurring opinion in the Supreme Court lamented in a slightly different context, "the structure and wording of § 1447(d)(2000 ed.) leave us no other choice.  There is no latitude for us to reach a different result.  If it is true that the statute as written and the judgment we issue today are inconsistent with the intent and purpose Congress wanted to express, then the immediate jeopardy [to a claim of immunity] should justify urgent legislative action to enact the necessary statutory revisions." *Powerex* [*Corp. v. Raliant Energy Servs., Inc.*, ___ U.S. ___], 127 S.Ct. [2411] at 2421 (Kennedy, J., concurring)[(2007)].

36.    On October 5, 2007, the Seventh Circuit issued its mandate to the United States District Court for the Northern District of Illinois.

37.    On November 15, 2007, 2007, the United States District Court for the Northern District of Illinois issued the following order in response to Hill's Motion for Remand Order, thus re-investing this Court with subject matter jurisdiction to hear and decide this case:

> Defendant's motion for remand order to the Circuit Court ... is withdrawn by agreement.   Petitioner/defendant's oral request for clarification is granted. On 5/17/2006 this Court remanded this action back to the Circuit Court of Lake County, Nineteenth Judicial Circuit.  The appeal in this matter was dismissed on 10/5/2007; therefore, the original order of 5/17/2006 is still in effect.

38.    Defendant/Petitioner Kirk Hill submits the accompanying Memorandum of Law in Support of his Petition, which establishes that he acted within the scope of his federal employment on March 5, 2002, during his alleged attack upon James Hall Foster.

WHEREFORE, for the reasons set forth in this Petition and the accompanying Memorandum of Law, Defendant/Petitioner Kirk L. Hill respectfully requests this Court to enter an order: (1) certifying that he acted within the scope of his federal employment as a Navy SEAL member on March 5, 2002; (2) striking the scope certification issued by the United States Attorney for the Northern District of Illinois; and (3) substituting the United States of America as the sole defendant in this action.

Respectfully submitted,

STELLATO & SCHWARTZ, LTD.

By: _____
David S. Allen

30707
Steven B. Borkan
David S. Allen
STELLATO & SCHWARTZ, LTD.
Attorneys for Defendant/Petitioner Kirk L. Hill
120 N. La Salle Street, 34th Floor
Chicago, Illinois  60602
(312) 419-1011

15

# EXHIBIT A

Complaint at Law
Page Two

8. That as a result of this unprovoked, willful, malicious and intentional assault and battery, plaintiff now greatly fears for his life and fears further injury and assaults from defendant, who is now at large in the community and no longer incarcerated for his actions.

9. That defendant has failed to make any attempt at restitution or amends for the damages sustained by plaintiff as a result of defendant's willful and intentional assault and battery.

10. That plaintiff demands trial by jury.


WHEREFORE, plaintiff JAMES FOSTER demands judgment against defendant KIRK L. HILL:

    a.    For a sum in excess of $100,000.00 for damages sustained by the willful and intentional assault and battery;

    b.    For a sum certain for court costs and litigation expenses in the prosecution in this action;

    c.    For other remedies at law which the court would find to be warranted and necessary.


               Respectfully submitted,

               **LOUIS G. ATSAVES, LTD.**
               **ADELINE J. GEO-KARIS & ASSOCIATES, LTD.**


               Louis G. Atsaves
               ARDC# 03123982

Complaint at Law
Page Three

## VERIFICATION

I, JAMES HALL FOSTER, the plaintiff in this matter, affirms that the statements made in this complaint at law are true and correct based on information available to the plaintiff.

James Hall Foster

Subscribed to and sworn to

before me this 27ᵗʰ

day of February, 2004.

NOTARY PUBLIC

OFFICIAL SEAL
MICHELLE S HAZELIP
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 07/14/07

# EXHIBIT B

# IN THE CIRCUIT COURT FOR THE 19TH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

JAMES HALL FOSTER,               )
                                        )
          Plaintiff,              )
                                          )
     vs.                                )      CASE NO:      04 L 180
                                          )
KIRK L. HILL,                   )
                                        )
          Defendant          )

## FIRST AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, JAMES HALL FOSTER, by and through his attorneys, STOTIS & BAIRD CHARTERED, and hereby complains of the Defendant, KIRK L. HILL, as follows:

1.      That on or about March 5, 2002, the Plaintiff, JAMES HALL FOSTER, was lawfully on the premises at the Great Lakes Navel Base, Gym 80 H, Men's Locker Room.

2.      That at said time and place, the Defendant, KIRK L. HILL, had a duty to use a reasonable degree of care for the safety of the Plaintiff.

3.      That notwithstanding said duty, the Defendant committed one or more of the following negligent acts:

     a.      failed to take medication needed to control his emotional condition, leading to his assault on the Plaintiff;

     b.      failed to seek medical care for his condition, when he knew, or with reasonable care should have known, that a failure to obtain treatment endangered the public, including the Plaintiff;

     c.      negligently caused physical injury to the plaintiff.



DEFENDANT'S EXHIBIT
"B"

4.    That as a direct and proximate result of one or more of the foregoing negligent acts, the Plaintiff sustained personal injury, was caused pain and suffering, disfigurement and disability, was caused to incur medical bills and to lose wages, all to his damage.

WHEREFORE, the Plaintiff demands judgment against the Defendant, KIRK L. HILL, in an amount in excess of $50,000.00, together with the costs of this suit.

STOTIS & BAIRD CHARTERED

200 West Jackson Boulevard
Suite 1050
Chicago, Illinois 60606-6941
312/461-1000
Attorney for the Plaintiff

By:  Michael S. Baird

# EXHIBIT C

8080              SBB:rhk            3/07/05              BLUE              15689-9-84

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

JAMES HALL FOSTER,              )
                               )
      Plaintiff,              )
                               )
vs.                            )        No.:   04 L 180
                               )
KIRK L. HILL,                  )
                               )
      Defendant.              )

## ANSWER

NOW COMES defendant, KIRK L. HILL, by his attorneys, STELLATO & SCHWARTZ,

LTD., and answering plaintiff's First Amended Complaint at Law states the following:

1.     Defendant lacks sufficient information as to the truth of the allegations contained

within paragraph 1, and therefore neither admits nor denies the same, but strict proof thereof is

demanded.

2.     The allegations in paragraph 2 are denied, although defendant admits to owing that

duty required by law.

3.     The allegations in paragraph 3, and each of them, including sub-paragraphs (a)

through (c), inclusive, are denied.

4.     The allegations in paragraph 4 are denied.

## AFFIRMATIVE DEFENSES

Defendant hereby reserves any and all rights it may have to raise affirmative defenses that

may be developed through the course of discovery in this litigation.

WHEREFORE defendant, KIRK L. HILL, denies plaintiff, JAMES HALL FOSTER, is

entitled to judgment against him in any sum whatsoever and asks that judgment be entered in his

**DEFENDANT'S EXHIBIT**

**"C"**

favor and against plaintiff.  Defendant demands a trial by jury.

STELLATO & SCHWARTZ, LTD.

By:  *[signature: Steven B. Borkan]*

Steven B. Borkan

## INSUFFICIENT KNOWLEDGE CLAUSE

Steven B. Borkan, being first duly sworn on oath, deposes and says that he is the attorney for defendant, KIRK L. HILL, in the above entitled cause; that he has read the foregoing Answer and knows the contents thereof and that the statements contained therein as to lack of knowledge sufficient to form a belief of truth and correctness are true.  Under penalty of perjury, I certify that the statements set forth in this paragraph are true and correct.

*[signature: Steven B. Borkan]*

Steven B. Borkan

8080
STELLATO & SCHWARTZ, LTD.
Attorneys for Defendant
120 N. LaSalle Street, 34th Floor
Chicago, Illinois 60602
(312) 419-1011

# EXHIBIT D



# U. S. Department of Justice

*United States Attorney*
*Northern District of Illinois*

*Thomas P. Walsh*
*Assistant United States Attorney*
*Chief, Civil Division*

*Dirksen Federal Courthouse*
*219 South Dearborn Street, Fifth Floor*
*Chicago, Illinois 60604*

Direct Line: (312) 353-5312
Fax: (312) 886-4073

June 27, 2005

M.H. Anderson
Captain, U.S. Navy Medical Corps
Commanding Officer
Naval Hospital
3001 A Sixth Street
Great Lakes, Illinois 60088-5230

Re:   Request for Representation/Substitution by HMC(Ret) Kirk L. Hill in *Foster v. Hill*,
      No. 04 L 180 (Circuit Court of Lake County, Illinois).

Dear Captain Anderson:

After reviewing all of the materials supplied by the Navy (transmitted to this office by letters dated March 16 and April 13, 2005), we have decided not to certify that Kirk L. Hill was acting within the scope of his Navy employment when he attacked James Foster at a gym on the Great Lakes Naval Base on March 5, 2002.

Whether a federal employee was acting within the scope of his employment at the time of the acts alleged in the complaint is a question of federal common law. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 435 (1995). To resolve this question, federal district courts look to the law of the state where the alleged acts occurred for guiding principles. *Snodgrass v. Jones*, 957 F.2d 482, 485 (7th Cir. 1992). Under Illinois law, which draws upon the Restatement (Second) of Agency, an employee's action falls within the scope of his employment if and only if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." *Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998) (quoting *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989)). A fourth factor is in play if force is intentionally used by the employee: "the use of force must not be unexpectable" by the employer. *Copeland v. County of Macon, Ill.*, 403 F.3d 929, 932 (7th Cir. 2005).

The first, third and fourth factors do not appear applicable to Mr. Hill's conduct. (We assume for the sake of argument that the third factor could be satisfied.) Although Mr. Hill had been a seasoned member of the U.S. Navy's elite special forces for years, once he was diagnosed with serious mental problems following an attack on an officer in Tennessee, he was transferred in a temporary duty status to Great Lakes Naval Hospital for treatment, not for combat. It was only because of Mr. Hill's apparent progress in his therapy that he had earned the privilege of working at the gym during his continuing treatment. Assuming that Mr. Hill thought he was attacking an



DEFENDANT'S
EXHIBIT

"D"

Captain M.H. Anderson
June 27, 2005
Page 2

enemy of the United States or a rogue faction of the SEALs in the gym locker room, it does not appear that his actions were "of the kind he was employed to perform" at the time in his temporary duty status. Likewise, we think that it was unexpectable to the Navy that as part of Mr. Hill's duties at the time that he would use any force against anyone.

Our research has disclosed a case that at first blush would seem to support the notion that Mr. Hill could have been acting in the scope of his employment. The case is coincidentally from this circuit, although it applies Wisconsin rather than Illinois law. In *Graham v. Sauk Prairie Police Commission*, 915 F.2d 1085 (7th Cir.1990), a local police officer assisted another officer in arresting a suspected drug offender by removing the suspect from his pickup, handcuffing him face down on the street, and then for no apparent reason, shooting him twice in the head. According to the court,

> . . . at the time [police officer] Mueller shot [the handcuffed detainee], Mueller was suffering from an acute exacerbation of a condition known as "schizophrenia, chronic paranoid reaction." The acute exacerbation resulted from Mueller's failure to comply with the prescribed use of his medication; this in turn caused Mueller's thoughts to become disorganized, caused him to have delusions about being threatened and resulted in periods of agitation. At the time he shot [the detainee], Mueller had become psychotic, lost contact with reality and was incapable of exercising reasonable judgment in the use of his weapon.

*Id.* at 1096. The Seventh Circuit agreed with the district court that the police officer was acting within the scope of his employment when he shot the detainee. But the court emphasized that *at the time* the officer shot the detainee, he was an on-duty, uniformed police officer, operating a patrol car in his jurisdiction, responding to a call for assistance. *Id.* at 1095. In other words, making arrests at that time and place was exactly what the officer's employer expected him to do, and while the officer clearly lost control as a result of his mental illness and used extraordinarily excessive force, the employer fully expected the officer to be making arrests and using force as necessary at the time of the shooting.

In contrast to the situation in *Graham*, Mr. Hill was far removed from any reasonable combat situation while on temporary detail for psychiatric treatment to Great Lakes Hospital. It is possible to imagine a scenario under which Mr. Hill might have been expected to react to a perceived threat with violence, but the exercise requires so much imagination that it would be difficult to say that the a the time of the attack, Mr. Hill was engaged in the kind of action he was employed to perform or that the use of force was expectable. According to the court in *Graham*, the "focus must be on the nature of the services contemplated" (*id.*), and it is simply too much of a stretch to conclude that Mr. Hill's locker-room actions while in that temporary duty status were of the kind that were contemplated.

If Mr. Hill wishes to challenge this decision, under 28 U.S.C. § 2679(d)(3), he "may at any time before trial, petition the court to find and certify" that he was acting within the scope of his

JUN-28-2005-TUE 04:07 PM                SH111                8152345739        P. 8

Captain M.H. Anderson
June 27, 2005
Page 3

federal employment. The petition would presumably be filed in the state court action, and would in all likelihood be removed to federal court.

We sympathize with Mr. Hill and his family (and of course with Mr. Foster as well). It appears from the materials that we have reviewed that the attack was clearly the product of the mental illness that Mr. Hill was suffering from at the time. While we cannot "scope" Mr. Hill for purpose of the Federal Tort Claims Act, we have made an effort to reach out to the mental health legal community for advice on resources that might be available to him in connection with this matter. We will be happy to share what limited information we have learned with your staff.

Thank you for your consideration and patience. If there are any questions, please contact the undersigned.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By: _Thomas Walsh_

THOMAS P. WALSH
Assistant United States Attorney
Chief, Civil Division

cc:    Commander C.J. Bullock
       Naval Hospital
       3001A Sixth Street
       Great Lakes, Illinois 60088-5230

# EXHIBIT E

Order Form (01/2005)    Case 1:05-cv-06175    Document 30    Filed 05/17/2006    Page 1 of 1    *GT*

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 05 C 6175 | **DATE** | 5/17/2006 |
| **CASE TITLE** | James Foster vs. Kirk Hill | | |

**DOCKET ENTRY TEXT**

For the reasons stated in the Court's memorandum opinion dated 05/17/06, petitioner Kirk Hill's petition "to find and certify that he was acting within the scope of his federal employment and substitute the United States of America as the sole defendant is denied. The Court further dismissed the United States as a defendant in this case and remands this action back to the Illinois State Court. It is hereby ordered that this matter is hereby remand back to the Circuit Court of Lake County, Nineteenth Judicial Circuit.

■ [ For further detail see separate order(s).]                    Docketing to mail notices.

| U.S. DISTRICT COURT | Courtroom Deputy Initials: | maw |
|---|---|---|

2006 MAY 18 AM 7: 52

FILED-EC-


DEFENDANT'S
EXHIBIT
"E"

A    001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES HALL FOSTER,                          )
                                            )
              Plaintiff,                    )
                                            )
        v.                                  )        No. 05 C 6175
                                            )
KIRK L. HILL,                               )
                                            )
              Defendant.                    )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Petitioner Kirk L. Hill's ("Hill")

petition "to find and certify that he was acting within the scope of his federal

employment and substitute the United States of America as the sole defendant."

("Petition") (Pet. 1).  For the reasons stated below, we deny the Petition.


## BACKGROUND

Hill contends that he was a member of a United States Navy Sea Air Land

("Seal") team from 1998 through 2003.  Hill contends that in 1993, his unit was

deployed to Somalia and that he also served in other locations overseas.  Hill claims

that in September 2000, he was transferred to the Naval Personnel Command in

Millington, Tennessee.  According to Hill, in July 2001, he began having delusions

about possible spies that were infiltrating Seal teams and, because of those delusions,

he was sent to the Great Lakes Naval Hospital ("Hospital") for evaluation. James Hall Foster ("Foster") was a civilian employee for the Navy Drug Screening Laboratory at the Hospital, and also worked out at the Hospital gym ("Gym"). Hill alleges that on March 5, 2002, he saw Foster at the Gym and Hill thought that Foster was a Somali warlord who was there to kill him. Hill contends that, believing that he could act according to the rules of engagement with an enemy, he took a weight bar from a weightlifting machine and, without provocation, struck Foster with the bar. Hill filed a complaint in state court and the case was removed to the federal court. Hill is now before this court requesting that the court certify pursuant to 28 U.S.C. § 2679 (d)(3) that Hill was acting within the scope of his employment when he struck Foster.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 2679 (d)(3):

> In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant . . . .

28 U.S.C. § 2679 (d)(3). To determine whether a federal employee was acting within the scope of his employment, the court must consider the common law of the state in which the alleged acts occurred. *Snodgrass v. Jones*, 957 F.2d 482, 485 (7th

Cir. 1992). Under Illinois law, an employee's conduct is within the scope of his employment if: 1) "it is of the kind he is employed to perform," 2) "it occurs substantially within the authorized time and space limit," 3) "it is actuated, at least in part, by a purpose to serve the master," and 4) "force is intentionally used by the servant against another [and] the use of force is not unexpectable by the master." *Copeland v. County of Macon, Ill.*, 403 F.3d 929, 932 (7th Cir. 2005)(citing *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989)); *Taboas v. Mlynczak*, 149 F.3d 576, 582 (7th Cir. 1998)(citing *Pyne*, 543 N.E.2d at 1308).

## DISCUSSION

As an initial matter, we note that the parties agree that the United States Attorney General refused to certify that Hill was acting within the scope of his employment when he struck Foster. In addition, the United States concedes that Hill was acting out of a desire to serve the United States when he struck Foster.

### I. Type of Work Hill Was Employed to Perform

The United States argues that at the time of the incident, Hill was temporarily assigned to assist the Physical Readiness Coordinator ("Coordinator") at the Hospital and that Hill was not told that he could engage in combat-type missions at the Hospital. The evidence shows that Hill's duties involved leading exercises and stretching for overweight sailors. (Hill Dep. 42-43). Hill argues that the United States government "trained Hill to instinctively be a Seal at all times . . . ." (Reply

10). We disagree. It has been shown that Hill was trained to follow orders and that he was given different orders for different scenarios. (Hill Dep. 17, 19). For instance, Hill testified at his deposition that he was trained how to act under rules of engagement when in combat and that he was also trained how to act under a different set of rules when engaging in a training mission. (Hill Dep. 29).

On the date that Foster was struck by Hill, Hill was under orders to assist the Coordinator at the Hospital. There has been no showing that Hill was authorized to use the rules of engagement that he used in Somalia during his assignment at the Hospital. (Hill. Dep. 42-45). The fact that Hill used the rules of engagement at the Hospital Gym merely indicates his mental delusions and does not show that the United States government authorized him to use the rules of engagement at this time. There has been no showing that there was a particular security threat at the Hospital and the United States government could not reasonably have anticipated that Hill was going to use the rules of engagement for combat at the Gym. Hill testified that he was authorized to use force against an enemy combatant, but there is no evidence that would suggest that the United States government, in assigning Hill to work at the Hospital, anticipated that he would encounter an enemy combatant or authorized the use of the rules of engagement for combat in regard to any individual at the Hospital. (Hill Dep. 41). Therefore, Hill has not shown that he was engaging in the type of work that he was employed to do at the Hospital at the time of the incident.

## II. Whether Conduct was Substantially Within Authorized Time and Space Limits

Hill argues that he, as a Seal, was trained to act according to his instincts in dealing with enemy combatants, regardless of where such enemies were found. However, Hill testified at his deposition that he was trained to follow orders. (Hill Dep. 17, 19, 29). When Hill was on a combat mission he was instructed to act in his Seal capacity and was allowed to consider certain factors and use his instincts. (Hill. Dep. 19). However, the evidence shows that Hill's conduct at the Hospital was not during a time period when he was authorized to act as a Seal or within the geographic area in which he was authorized to act as a Seal. In addition, the evidence shows that even at the Hospital on March 5, 2002, Hill was not scheduled to begin work until 1:00 p.m., and that he struck Foster at approximately 12:30 p.m., before he began work. (Shepherd Statement 1); (Runnels Statement 1)(Investigative Service Report 1)(Ex. 3 Cal.). The evidence further shows that Hill was at the Hospital Gym before his scheduled work and was lifting weights and playing basketball, which are recreational activities. Therefore, Hill has not shown that his conduct was substantially within the authorized time and space limits of his employment when he struck Foster.

## III. Expectation of Use of Force

Hill argues that he was trained to act as a Seal in order to "kill enemy combatants." (Reply 14). However, as is indicated above, Hill was also trained to

5

A    006

follow orders.  There has been no showing by Hill that he was authorized or expected to use force while on a temporary assignment at the Hospital, or that the United States government would have reasonably expected Hill to use force in order to perform his job as an assistant to the Coordinator at the Hospital.  Therefore, based on all of the above, we deny Hill's Petition.

## CONCLUSION

Based on the foregoing analysis, we deny Hill's Petition.  We also dismiss the United States as a Defendant in this case and remand this action back to the Illinois state court.

_Samuel Der-Yeghiayan_
Samuel Der-Yeghiayan
United States District Court Judge

Dated:  May 17, 2006

A    007

# EXHIBIT F

30707        10/20/05        SBB:dsa                    WHITE              15689-9-66

# IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

JAMES HALL FOSTER,                      )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )        No.: 04 L 180
                                        )
KIRK L. HILL,                           )
                                        )
            Defendant.                  )

## AFFIDAVIT OF KIRK L. HILL

KIRK L. HILL, being under oath, depose and state as follows:

1.      I am the defendant in this lawsuit now pending in the Circuit Court of the Nineteenth

Judicial Circuit, Lake County, Illinois.

2.      My date of birth is April 24, 1965. I was born in Monterrey, California. I worked as

an Emergency Medical Technician during high school, and graduated high school in 1983. I then

worked full time in a scrap yard, and joined the United States Navy when I was 19-years old, on

October 9, 1984. When I was 23 years old, I became a member of the United States Navy's SEa Air

Land ("SEAL") team. I married my wife, Susan Hill, in Las Vegas, Nevada on June 16, 1991, and

we have two children, a 17 year old stepdaughter and an 11 year old son.

3.      While on active duty, I earned three college degrees: (1) an Associate's in Liberal

Arts from the University of Maryland in 1988; (2) a Bachelor of Science in Vocational Education

from Southern Illinois University in 1992; and (3) an Associate in Science in Emergency Medical

Technology from Tidewater Community College in 1996.

4.      As a Navy SEAL member, my Navy commands and training attended included the



DEFENDANT'S
EXHIBIT
"F"

following:

- October 1984 - January 1985: Recruit, Boot Camp, Great Lakes, Illinois;
- January 1985 - April 1985: Student, Hospital Corpsman School, Great Lakes, Illinois;
- April 1985 - August 1986: Emergency Room Technician, Naval Hospital, Groton, Connecticut;
- August 1986 - August 1988: Emergency Room Technician, Naval Hospital, Keplavik, Iceland;
- August 1988 - March 1989: Student, Navy SEAL Training, Naval Special Warfare Center;
- March 1989 - April 1989: Student, Jump School, Fort Benning, Georgia;
- April 1989 - May 1989: Student, Special Operation Technician Training, Naval Special Warfare Center;
- May 1989 - August 1994: Navy SEAL Operator, SEAL Team Five;
- June 1989: Student, North Island Naval Base Survival Evasion Resistance and Escape Training;
- August 1990: Student, Department of the Navy, Jungle Environmental Survival Training;
- July 1992: Student, SEAL Scuba Diving Supervisor, Naval Special Warfare Center;
- August 1994 - April 2000: Navy SEAL Operator, SEAL Team Six;
- August 1994: Student, Mid-South Institute of Self-Defense Shooting, Practical Pistol and Subgun Course;
- August 1994: Student, Tactical Rifle Course, Mid-South Institute of Self-Defense Shooting;
- December 1994: Student, International Training Incorporated, Antiterrorist Driving and Surveillance Detection Course;
- February 1995: Student, Jarvis International Intelligence, Methods of Entry;
- June 1995: Student, Advanced Pistol Training Course, Rogers Institute of Advanced Weapon Craft;
- November 1995: Student, Department of Defense High Risk Survival, Joint Service Survival Evasion Resistance Escape ("SERE") Agency;
- February 1997: Student, Emergency Medical Technician-Paramedic, Tidewater Community College;
- June 1999: Student, Range Operations Safety, Naval Special Warfare Center;
- February 2000: Student, Static Line Jump Master, Naval Special Warfare Center;
- March 2000: Student, Military Freefall Jump Master, United States Army Special Warfare Center and School; and
- April 2000 - September 2001: Navy SEAL Detailer, Navy Personnel Command.

5.    As a Navy SEAL, I was assigned to the following Wartime Deployments, and

served in approximately 67 "Real World Missions":

2

- August 1990-April 1991: Desert Shield/Storm;
- October 1993-February 1994: Commander Joint Task Force ("COMJTF") Somalia;
- April 1997- August 1997: Bosnia.

6.　　A "Real World Mission" is a task assignment to perform a mission during times of war, such as removing a war criminal from Bosnia, or leading a sniper team in Mogadishu, Somalia.

7.　　I am qualified as a SEAL and an Independent Duty Corpsman. I am also qualified as a Diving Supervisor, Range Safety Officer, Free-Fall Jump Master, Static Line Jump Master, and Nationally Certified EMT Paramedic.

8.　　I have received the following Military Awards: Joint Service Commendation Medal (2 times); Navy Commendation Medal; Joint Service Achievement Medal; Navy Achievement Medal (3 times); Combat Action Ribbon (2 times); Joint Meritorious Unit Award; Navy Unit Commendation; Navy Meritorious Unit Commendation (2 times); Navy E Ribbon; Navy Good Conduct Medal (4 times); Europe, Africa, Middle Eastern Campaign Medal; National Defense Service Medal; Armed Forces Expeditionary Medal; Armed Forces Service Medal; Navy Sea Service Ribbon (3 times); Navy Marine Corps Overseas Ribbon (2 times); United Nations Medal; NATO Medal; Kuwait Liberation Saudi Arabia Medal; Kuwait Liberation Kuwait Medal; Navy Rifle Medal (expert); and Navy Pistol Medal (expert).

9.　　In September 2000, I was assigned to my first shore-duty position in 15 years at the Naval Personnel Command in Millington, Tennessee. Before being assigned to this shore-duty position, I served 13-years of "straight sea time," meaning that I was under constant deployment because I went from one SEAL assignment to another.

3

10.    In July 2001, I started experiencing problems at work. I started having delusions that there was an "insurgence" of SEAL Teams members from the West Coast who were trying to infiltrate and take over the East Coast SEAL Teams, that the participants in this "insurgence" had conspired to ruin me and sabotage my career, and that Master Chief Rick Culley, my immediate supervisor at Navy Personnel Command, was a central figure in this conspiracy.

11.    One day after I started having these delusions, Master Chief Culley and I were working at our respective terminals, and I turned and said to him, "you have to go away or I will kill you, I will kick your ass." Master Chief Culley and I then stepped outside, and I demanded to know who he worked for, and accused him of working for Jay Sorer, a "big mafia boss," controlling the "special warfare universe." (Jay Sorer is a retired Boatswain Mate, whose last duty station was a at Naval Special Warfare Group).

12.    In July 2001, Master Chief Culley and Petty Officer Pugh bought me a taco from Taco Bell. I believed that they had injected poison in the taco, and I took the taco to Naval Criminal Investigative Service to have the taco tested for toxins, but they refused to test the taco.

13.    On September 14, 2001, my immediate supervisor – Master Chief James Culley – took me to a psychiatrist on base.  After that, Master Chief Culley continued to work with me on a daily basis.

14.    On September 24, 2001, I approached Master Chief Culley while he was in his work cubicle, and placed him in a choke hold. I thought that he was part of the conspiracy to get me, to sabotage my career.  Military Police found that I had a 14-inch lead pipe, with a thick end cap in my waistband, and a Spiderco knife.

4

15.　　After this incident with Master Chief Culley, I was hospitalized on an in-patient basis at Great Lakes Naval Hospital. In approximately January 2002, I was at Great Lakes Hospital on an out-patient basis. While on an out-patient basis, the Navy assigned me the job of Physical Readiness Trainer, and I was required to work at the gym at Great Lakes Naval Hospital. I had previously performed the duties of Physical Readiness Trainer incident to my duties as a Navy SEAL.

16.　　On March 5, 2002, while at work as a Physical Readiness Trainer at the Great Lakes Naval Hospital gym, I encountered a gentleman, who I later learned was James Foster. I had never seen Mr. Foster before this encounter, and had no resentments or ill will toward him.

17.　　On March 5, 2002, I had a delusion that Mr. Foster was a Somali Warlord that had come to kill me. As the result of this delusion, I resorted to my Navy SEAL training and acted according to the Navy SEAL rules of engagement during my active duty in Mogadishu, Somalia.

18.　　Under the Navy SEAL rules of engagement during my active duty in Mogadishu, Somalia, and my general Navy SEAL training, I was trained to kill an enemy combatant if I perceived them to be a threat to me or the men in my command, without first securing a superior officer's order. I learned those rules of engagement during my seven months in Somalia, while leading a four-man sniper team in Mogadishu.

19.　　Because I believed that Mr. Foster was a Somali Warlord and enemy combatant who was there to kill me, I struck him in the back of the head with a weight, and then effectuated my escape. That night, I was arrested at my home by an officer from Naval Criminal Investigations and taken to the Naval Great Lakes Brig.

20.　　On April 4, 2002, I was transferred from Naval Great Lakes Brig to the Naval Consolidated Brig in Miramar, California, where I remained in solitary confinement.

21.     The United States charged me with two specifications of assault for the incidents involving Master Chief Calley and James Foster.   On February 5, 2003, Rear Admiral J.L. Betancourt issued an Order in those courts martial charges dismissing those charges based on my mental condition. I received a copy of that Order, a true and accurate copy of which is attached to this Affidavit.

KIRK L. HILL

## CERTIFICATION

Under penalty of perjury, I certify that the statements set forth in this instrument are true and correct, except as to matters herein stated to be on information and belief, and as to such matters I certify that I verily believe the same to be true.

KIRK L. HILL

30707
STELLATO & SCHWARTZ, LTD.
Attorneys for Defendant - KIRK L. HILL
120 North La Salle Street, 34th Floor
Chicago, Illinois 60602
(312) 419-1011

6.2003  10:21AM

UNITED STATES          )
                       )    DISMISSAL OF CHARGES
        v.             )
                       )
KIRK L. HILL           )
HMC(SEAL), USN         )

---

## ORDER

    All charges previously preferred under the Uniform Code of Military Justice against HMC Kirk L. Hill, USN, 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, are hereby dismissed solely for reasons related to his mental condition.


                               J. L. BETANCOURT
                               Rear Admiral, United States Navy
                               Commander, Navy Region Southwest

                     Date: _J. Betancourt_          5 Feb 03


L. Tomsett

MAY 0 4 2004

COMMANDER, NAVY REGION SOUTHWEST
GENERAL COURT-MARTIAL CONVENING AUTHORITY
IN CASE OF

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v.<br><br>KIRK L. HILL<br>HMC (SEAL), USN<br>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 | COMMITMENT TO CUSTODY OF<br>ATTORNEY GENERAL FOR THE<br>UNITED STATES OF AMERICA<br>FOR RESTORATION OF<br>COMPETENCY TO STAND TRIAL |

## ORDER

On 30 July 2002 a 706 Medical board heard the matter of Hospital Corpsman Chief (Seal) Kirk Lee Hill, U.S. Navy, and made a determination with respect to his ability to stand trial. HMC Hill is charged with assault in which grievous bodily harm is intentionally inflicted/likely to produce death or grievous bodily harm, in violation of UCMJ, Article 128, two specifications.

The 706 board concluded that: (1) at the time of the criminal conduct in question, the accused had a severe mental disease; (2) at the time of the criminal conduct, he was unable to appreciate the wrongfulness of his acts; and (3) the accused is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly or intelligently in his defense.

Therefore, pursuant to 10 U.S.C. §876b (a)(2), and, in turn, in accordance with 18 U.S.C. §4241(d), it is hereby directed that the accused be committed to the custody of the United States Attorney General, and that he be transported to a suitable facility for hospitalization and treatment for a period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future the accused will attain the capacity to permit the trial to proceed.

If the director of the treatment facility determines the accused has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him, and to assist properly in his defense, he shall promptly transmit a notification of that determination to the Attorney General and to Commander, Navy Region Southwest, San Diego, California, the Officer Exercising General Court-Martial Convening Authority in this matter, with a copy to the Accused's Detailed Defense Counsel, in accordance with 10 U.S.C. §876b (a)(4)(A).

L.'I Tomsett

MAY 0 4 2004